**MIDWEST FUR PRODUCERS ASSOCI-ATION, a corporation, K. T. Orr, and Chester A. Noltimier, Plaintiffs,**

v.

**MUTATION MINK BREEDERS ASSOCI-ATION, a corporation, and Harvey Schroeder, Defendants.**

Civ. A. No. 528.

United States District Court
W. D. Wisconsin.

Dec. 4, 1954.

As Amended Jan. 14, 1955.

Lee Loevinger, Minneapolis, Minn., Horace W. Wilkie, Madison, Wis., for plaintiffs.

Gerrit P. Groen, Chicago, Ill., Joseph G. Werner, Madison, Wis., for defendants.

STONE, District Judge.

This is an action to secure a declaratory judgment declaring the rights of the parties and determining the validity of alleged trade-marks, to secure an injunction against restraints of trade and unfair competition, to secure cancellation of a trade-mark, and for other relief. By Counterclaim defendant Mutation Mink Breeders Association sought a judgment for trade-mark infringement and unfair competition by the plaintiffs, and other relief. It arises under, and jurisdiction is conferred upon the Court by Title 28 United States Code Annotated, §§ 1331, 1332, 1337, 1338 and 2201, and Title 15 United States Code Annotated, §§ 26, 1119 and 1121.

Prior to trial the parties stipulated to first litigate and submit to the Court those issues arising out of the last Amended Complaint, save and except Counts 5, 6, 7, 8, 11 and 12 thereof, and paragraphs 5, 6(e), 6 (f), 6(g) and 7 of the Prayer for relief therein, and the Answer to the Amended Complaint, save and except paragraph 96 thereof, and the Counterclaim, save and except paragraphs 2 and 3 of the Prayer therein, and the Reply to the Counterclaim, save and except paragraphs 14 and 15 thereof, reserving, however, the right to later litigate the other issues raised by the pleadings after the Court has rendered its decision if they are unable to agree upon a final disposition of the points of controversy remaining between them.

The action was tried before the Court without a jury, at Wausau, Wisconsin; plaintiffs appearing by Lee Loevinger of Minneapolis, Minnesota, and Horace W. Wilkie of Madison, Wisconsin; and defendants appearing by Gerrit P. Groen of Chicago, Illinois, and Joseph G. Werner of Madison, Wisconsin; and the Court having considered the evidence and briefs submitted by the parties hereto, and being fully advised in the premises, does hereby make the following:

Findings of Fact

1. Midwest Fur Producers Association, a plaintiff herein, is a Minnesota nonprofit cooperative association, incorporated in 1948. It is sometimes called, and is herein referred to, as "Midwest." The members of Midwest are producers of farm or ranch raised fur-bearing animals, including mutation mink, and one of its purposes is to assist its members in marketing their fur pelts.

2. K. T. Orr, a plaintiff herein, is an individual who is a resident and citizen of the State of Minnesota. He is engaged in raising mutation mink of various kinds and selling the pelts therefrom, and is a member and officer of Midwest. The pelts sold by Orr each year amount to substantially more than $3,000 in value.

3. Chester A. Noltimier, a plaintiff herein, is an individual who is a resident

and citizen of the State of Minnesota. He is engaged in raising mutation mink of various kinds and selling the pelts therefrom, and is a member of Midwest. The pelts sold by Noltimier each year amount to substantially more than $3,000 in value.

4. Mutation Mink Breeders Association, a defendant herein, is a cooperative association incorporated in Wisconsin on March 24, 1942, under the name "Silver Blu Platinum Mink Association". It later changed its corporate name to "Mutation Mink Breeders Association". It is sometimes referred to as "MMBA" and also as "EMBA", and will be referred to by such terms herein. The members of MMBA are producers of farm or ranch raised mutation mink.

5. Mink in the natural state has fur of a dark brown color. Such mink are commonly known in the fur trade as "standard" or "dark" mink. Such mink have been bred on fur farms or ranches for more than twenty years, and the trade in the pelts of such mink has been an important element in the fur trade during that period of time.

6. In the breeding of dark mink occasionally mutations will occur which have fur of a different color than the standard or dark mink. Such mutations will usually breed true, according to Mendelian principles of heredity or genetics, so that strains of mink with substantially different colored fur than the standard or dark mink may be developed. Such genetic lines are known variously as "strains", "breeds" or "color phases." The terms "strain," "breed" and "color phase," with reference to mink, apart from their scientific usage, are used interchangeably. The strains of mink which have fur that is colored differently than the standard or dark mink are known as "mutation mink."

7. The common generic names, platinum, pastel, black cross, ruby-eyed pastel and sapphire, were all adopted and used prior to the advent of MMBA's trade-mark, and they are still in use. The principal segments of the fur trade are the producers, auction companies, brokers, dealers, manufacturers and retailers. The producers are the fur farmers or ranchers, including those who are members of Midwest and MMBA. Auction companies are enterprises to which the producers ship their pelts, who perform various services such as sorting and grading the pelts, and who periodically hold public auctions at which the pelts are sold. Brokers are enterprises to which producers ship their pelts to be sold and who operate by disposing of the pelts by negotiations and private sale rather than by public auction. Dealers buy pelts, usually in quantity, sort and store the pelts if necessary, and sell the pelts to manufacturers or retailers. Manufacturers make fur pelts into fur garments. Retailers sell the fur garments to the public. The functions of these various segments of the trade are not necessarily mutually exclusive. Some retailers do their own manufacturing and buy pelts directly from auction houses, brokers, or even fur farmers. Some manufacturers buy pelts from auction houses, brokers, or fur farmers. Some dealers buy directly from fur farmers. In general, the categories mentioned herein are recognized as being the various branches of the fur trade. There are approximately 6,100 mink farmers in the United States, 3,482 of which are members of MMBA; 1,300 reside in Wisconsin, 650 of which are members of MMBA. MMBA determines what mink pelts may be sold through its organization and under its trade marks. When mink pelts are sold at auction through MMBA it furnishes the purchasers with silk labels bearing its trade-mark for use by manufacturers on the ultimate garment. In preparing pelts for sale at MMBA sales, the pelts are graded and classified as to color. They usually fall into four grades. Its trade-marks are applied to the better-grade pelts only, usually Grades 1 and 2, and then placed on exhibit at auction house display rooms. Low-grade pelts from MMBA members when sold do not bear the MMBA trademarks. In 1948, MMBA adopted the

overall house mark "EMBA" and used it in direct advertising along with its secondary marks as "EMBA Silverblu" and "EMBA Royal Pastel". Prior to its adoption of the overall mark "EMBA", pelts sold at EMBA sales were stamped with trade-marks such as Silverblu, Royal Pastel, and others. Now only the overall house mark "EMBA" is applied in a permanent manner, and tags and silk labels are furnished purchasers, bearing its specific secondary marks, which are designed to follow the pelts through from the initial salesroom to the retailer. The total value of mutation mink pelts marketed through MMBA in 1944 was $350,000; in 1953 it exceeded $24,-000,000. The New York Auction Company has handled MMBA sales for more than ten years past. MMBA determines what mink pelts may be sold through its organization. The only charge made to its members for sales is 1½ per cent of pelt sales receipts. There is no membership fee. MMBA expends 90% of its annual income, approximately $200,000, advertising mutation mink in this country and abroad. It advertises nationally in "Vogue", "Town and Country", and "Harper's Bazaar". Throughout its advertising it has stressed its trade-marks, using them with each new color phase of mutation mink when the color phase was stabilized and available in marketable quantities.

8. The two largest fur auction companies are located in New York, N. Y. The third largest fur auction company is located in Minneapolis, Minnesota. There is also a fur auction company in Seattle, Wash. Most of the fur brokers, dealers and manufacturers of the United States are located in New York, N. Y.

9. A very large proportion of the fur pelts produced and sold by members of Midwest and MMBA, amounting in the aggregate to millions of dollars worth annually, are shipped in interstate commerce from the State in which such pelts are produced to some other State, principally the State of New York, either for sale or processing and manufacture or for both.

10. Mutation mink have appeared from time to time on fur farms during almost as long a period as mink have been bred on farms. However, the first commercial breeding of a mutation strain began about 1941 or 1942.

11. The first commercially important strain of mutation mink was known originally as "platinum", and later as "silverblu" or some variant of that term, and "silverblu platinum".

12. Under the original By-laws of MMBA the members consisted of persons engaged in breeding "silverblu platinum mink" and one of the purposes of the organization was to improve the methods of breeding "silverblu platinum mink". These By-laws were not changed until 1951, when they were superseded by new By-laws which referred to "mutation mink" and omitted any reference to any particular kind of mutation.

13. Prior to 1940 fox, rather than mink, was commercially the most important of the ranch furs. At this time there were varieties or color phases of fox known as "silver fox" and as "blue fox" and as "platinum fox". Late in the 1930's a variety of fox which was called "silverblue" was developed, and garments made from the pelts of this variety of fox were advertised and sold under the name "silverblue" at least as early as mink pelts or garments were sold under any similar name.

14. The name "silverblue" or "silverblu" was first suggested for use referring to mink or mink pelts in 1941 by a fashion stylist to whom the fur had been described as "silvery blue" by certain fur farmers. The name apparently came to mind because of the color of the fur, and it soon gained wide acceptance because of its descriptive quality.

15. The fur of the platinum or silverblue mink was described by some of the first breeders as "silvery blue", and similar descriptions have been given on innumerable occasions by breeders, advertising men, members of MMBA and others. Many advertisements of MMBA describe this kind of fur as "grey" or "silvery" combined with "blue" or "blu-

ish". The color connotations of the term "silver blue" are descriptive of the appearance of the mutation mink known as silverblu, and of the pelts from said mink.

16. In 1942 the term "silverblu" or "silver blu" began to be applied to the variety of mink which had before that been known as platinum. The term was used in all variations, with and without a hyphen, as one word and as two separate words, and with and without an ultimate "e". The term "silverblu", in all of its variations, was also used both by itself and in combination with the word "platinum".

17. The term "silverblu" and its variants were first used, so far as mink are concerned, to refer to the live animals of a certain strain or breed of mutation mink. This usage began in 1942 and has continued ever since. Breeding stock have been known, advertised and widely sold under the name "silverblu" and its variants, and many of the members of MMBA have sold breeding stock under such names. Members of Midwest have purchased breeding stock under such names from MMBA members and others. Live animal shows and books and discussions of genetics have used this term to refer to a strain or breed of mink.

18. The first use of the name "silverblu" in connection with the sale of a mink garment was on January 1, 1943.

19. The circumstances of the first sale of a mink garment under the name "silverblu" were that the pelts to make the garment were selected by a representative of one of the auction companies and were donated for this purpose by the individual fur farmers who owned the animals; the manufacturing was done by a commercial manufacturing firm and the cost was paid for by Fromm Brothers, a leading fur ranch of Marathon County, Wisconsin. The garment was sold at a New Year's eve party in New York City on January 1, 1943. Mr. Edward Fromm acted as an auctioneer and the garment was sold to a theatrical producer. The proceeds of the sale were donated to a charitable cause. The fur farmers who donated the pelts to make the coat were at that time members of MMBA, but Fromm Brothers were not.

20. The first use of the name "silverblu" in connection with the sale of mink pelts was on January 19, 1944. On this date a number of pelts belonging to individual fur farmers were sold at an auction company in New York City under that name.

21. One of the purposes of those who first formed the Silver Blu Platinum Mink Association was to control the breeding and marketing of silverblu platinum mink and pelts. The original By-laws required that all members agree to sell breeding stock only to persons who would agree to join the association; and the forms of bill of sale for the sale of breeding stock which were furnished by the association to its members contained an agreement by the purchaser to join the association. This attempt to require all breeders of silverblu platinum mink to join the Silver Blu Platinum Mink Association was found to be impractical and was abandoned.

22. As another method of controlling the trade in mutation mink, the Silver Blu Platinum Mink Association, then known as Silverblu Mink Breeders Association, sought to claim exclusive trade-mark rights in the name "silverblu" as applied to mink, including both live mink and pelts. On April 12, 1944 the association filed applications to register the name "silverblu" as a trade-mark for live mink animals, mink pelts and fur garments. In these applications the association claimed use of the name on live animals and pelts since March 14, 1942, and on fur garments since January 1, 1943.

23. The registrations sought by these applications were refused on the grounds, among others, that the name "silverblu" is the name of a breed of mink, that there can be no trade-mark rights in an organic animal which is reproductive, and that the name is merely descriptive.

24. Thereafter the applications for registration were amended by the Silver-

blu Mink Breeders Association to eliminate the claim of use of the name silverblue for live animals and to seek registration under the Act of Congress of March 19, 1920,[1] rather than the 1905 Trademark Act,[1] and the association, through its attorneys, represented to the Patent Office that the name was not used to refer to a variety or breed of mink and that no other person, firm, corporation or association than the applicant had the right to use the name.

25. On August 14, 1945, the Patent Office registered the name "silverblu" as a trade-mark under the Act of Congress of March 19, 1920, of MMBA for mink pelts and fur garments. The numbers of said registrations are, respectively, No. 415,719 and No. 415,720.

26. Although there has been no consistency in the form of the term "silverblu", a number of variants having been used, this name has been and is generally and almost uniformly used in the fur trade to designate a particular strain or breed of mutation mink and the pelts derived from it. Until the beginning of the controversy between MMBA and Midwest silverblu was practically the only name used in the fur trade for that particular type of mink or pelt. However, the word "platinum" has been used in the industry interchangeably with "silverblu" to identify the silverblue pelts and garments.

27. Since the beginning of its controversy with Midwest, and particularly since the inception of this action, MMBA has made some effort to have the term "platinum" used in place of the term silverblu as the generic name for the type of mink and pelt. The auction companies, which are dependent upon MMBA and its members for a very large share of their business, have acceded to the request of MMBA to use "platinum" as the generic name rather than silverblu. However, the rest of the fur trade continues to use the term silverblu as the common name for a particular type of mutation mink with a greyish-bluish fur

and for the pelts derived from this type of mink.

28. In the retail trade the term silverblu is used exclusively as the name under which the garments are sold which are made of fur of this type of mink. Aside from so-called co-operative advertisements inserted by MMBA itself with the cooperation of various retailers, the word "platinum" has not been used at all with reference to mink in recent years in retail advertising.

29. In the retail fur trade the word "silverblu" or "silverblue" is clearly used to designate a particular color or shade of fur. The term is widely used to advertise not only mink, but also muskrat and other kinds of fur. Not infrequently the term will appear in a single advertisement with reference to both mink and muskrat fur garments. In addition to the use of this term for a certain type of fox fur, previously mentioned, the word "silverblue" appears in the unabridged dictionary as the name of a breed of rabbit.

30. Both the fur trade generally and the general public understand the term "silverblu" or "silverblue" to indicate fur of a particular shade of color, and particularly mutation mink fur of a particular kind.

31. Prior to 1950 MMBA charged a small membership fee of those joining the association. The total revenue from this source was not large. The principal source of revenue for the association was derived from a deduction made by the auction companies, in addition to their regular fees, from the sales price of mutation mink pelts sold by them, which deduction was remitted to MMBA. This deduction was a small percentage of the sales price, and the actual percentage varied from time to time and was different for various types of mutations. The deduction was made pursuant to contracts executed between MMBA and the auction companies. MMBA sought to have the pelts of all members sold through these auction companies, and the

1. Now 15 U.S.C.A. § 1051 et seq.

members of MMBA agree to market their pelts with the auction companies which have such contractual arrangements with MMBA.

32. Until the spring of 1950, the auction companies with which MMBA had contracts sold the pelts of both members of MMBA and non-members of MMBA at the same times and in the sames sales and under the same names. The various types of mutation mink pelts were sold as "silverblu", "royal pastel" and the other respective names claimed by MMBA as trade-marks, regardless of whether the producer of the pelts was or was not a member of MMBA. Sales for nonmembers were handled in the same manner as the sales for members. The same deduction from the sales price of the pelts was made for the account of MMBA regardless of whether the producer of the pelts was or was not a member of MMBA. If any producer who was not a member of MMBA objected to the deduction and requested its return to him, then the money would be refunded. This arrangement was with the full knowledge, consent and participation of MMBA.

33. In 1950 MMBA decided that beginning with the 1950–1951 selling season, which started in December, 1950, the pelts of members of MMBA should be sold at separate "MMBA sales", and that the pelts of producers who were not members of MMBA should not be sold in such sales. At the same time MMBA dropped all membership charges and permitted any producer of mutation mink to become a member of the association by signing an agreement to market his mutation mink pelts through the agencies with which MMBA had contractual arrangements and to permit a deduction from the sales price of his mutation mink pelts to be made by the selling agencies and remitted to MMBA.

34. On May 12, 1949, MMBA filed two applications for registration of "silverblu" as a trade-mark for mink pelts and fur garments, respectively, seeking registration on the principal register under the 1946 Trademark Act, 15 U.S.C.A. § 1051 et seq. MMBA claimed use of this name in interstate commerce since March 14, 1942, on pelts and since January 1, 1943, on garments. In this application, MMBA represented that "applicant has had substantially exclusive and continuous use of the trademark in commerce for more than five years next preceding the date of filing of this application." In support of the application MMBA also filed an affidavit alleging, among other things, that "Silverblu pelts and garments have been sold extensively throughout the United States and some foreign countries since 1942."

35. In response to the applications and representations made in support thereof, MMBA was granted registration of the name "silverblu" as a trademark for fur garments on March 13, 1951, and for mink pelts on September 11, 1951, said registrations being numbered respectively No. 539,283 and No. 547,777.

36. The representations on which MMBA sought and secured registration of the term "silverblu" as a trade-mark under the several applications and registration numbers above referred to were erroneous and incorrect in each of the following particulars, among others:

(a) The name "silverblu" is and has been used as the common and generic name for a particular breed or variety of mutation mink since long prior to the first application for a trade-mark thereon, and has been so used by members of MMBA and by MMBA itself.

(b) The name "silverblu" was not used exclusively either by MMBA or by members of MMBA at any time prior to its said trade-mark application. Representatives of MMBA sought to have the Fromm Brothers relinquish their right to use of the name "silverblue" on fox in order to strengthen MMBA's claim to the name, but Fromm Brothers refused to give up their rights, although this fact was never disclosed by MMBA to the Patent Office. Prior to 1950 MMBA did not have exclusive use of the name "silverblu" since it acquiesced in the sale of pelts by mutation mink pro-

ducers who had no connection with MMBA through the auction houses under this name and accepted deductions from the sales price of the pelts of such non-members. Substantially all of the mutation pelts of this kind were sold under the name silverblu prior to 1950.

(c) That the first sale of pelts under the name silverblu was on January 19, 1944. MMBA, however, claimed the use of this name on pelts since March 14, 1942 and filed an affidavit claiming that silverblu pelts had been sold extensively throughout the United States and some foreign countries since 1942.

(d) The first garment sold under the name of silverblu was sold on January 1, 1943. This is the date of claimed first use on garments by MMBA in its application. Nevertheless, it filed an affidavit in support of its application in which it alleged that garments had been sold extensively throughout the United States and some foreign countries since 1942.

(e) The first sale of a silverblu garment was made on January 1, 1943, at a party in a New York hotel in New York City, N. Y., where those physically present bid on, and one of them purchased, the garment there sold in circumstances set out above. It was not sold by MMBA in interstate commerce on said date as claimed by MMBA.

(f) In its several applications, MMBA has claimed that the name silverblu has been used by it, a corporate entity, in the sale of pelts and garments. MMBA had no title to or interest in the garment sold on January 1, 1943, and did not claim or receive any of the proceeds of the sale. Likewise, MMBA had no title to or interest in any of the pelts sold on January 19, 1944, and it sold no pelts prior to that date. No other MMBA transactions disclosed by the record support its claim of use by MMBA of this name in a proprietary sense.

37. The name silverblu is the common, generic and descriptive name for a strain or breed of mutation mink and the pelts derived therefrom, and is generally used, recognized and understood as such by fur breeders, the fur trade and the public.

38. The name "royal pastel" is also claimed by MMBA as a trade-mark for mink pelts. On April 15, 1946, the association filed an application under No. 500,999 for registration of the name "royal pastel" as a trade-mark for mink pelts, claiming use of such name by it since February 15, 1946. No registration has issued for this name.

39. On February 15, 1946, a sale of mink pelts under the name royal pastel was held at an auction company in Seattle, Washington. The pelts which were sold at this sale included the pelts of a number of fur producers who were then members of MMBA. None of the pelts sold at this sale were pelts which belonged to MMBA itself, and, except for the deductions made from the sales price for its account, the proceeds of the sale did not go to MMBA.

40. That live mink were sold for breeding purposes under the name royal pastel at least as early as 1945 and prior to the first use claimed by MMBA on February 15, 1946. The name was also used with reference to live mink exhibited in mink shows in 1945, and was established among mink farmers and breeders as the common name of the particular mutation, prior to 1946.

41. During the latter part of the year 1945, and prior to the claimed first use by MMBA, there was at least one sale of a number of mutation mink pelts under the name royal pastel. This sale was at Seattle, Washington, by a mink farmer who was not a member of MMBA at the time.

42. Throughout the period from 1945 down to the time of trial, the name royal pastel has been commonly used for live mink by those in the fur trade. Breeding stock have been widely sold, by members of MMBA and others, under this name, and have been commonly purchased, by members of Midwest and others, under this name.

43. The name royal pastel has been widely used by retail furriers for mink

garments made of the pelts of animals known by that name, regardless of whether or not the fur was produced by a member of MMBA.

44. The retail furrier ordinarily does not know the source of the furs in the garments which are handled by him; and it is impossible to tell in most cases what the source of the furs in any particular mink garment is.

45. There are a number of different varieties of mutation mink of the so-called "pastel" type, all having fur of a light brownish color. These types include the stewart pastels, the green-eye pastels, the topaz and others. The royal pastel is one among the several varieties of pastel mutation mink. There is no general use by which this variety of mutation mink can be differentiated from other varieties of the pastel type other than the name "royal pastel".

46. The name royal pastel is the common and generic name for a strain or breed of mutation mink and the pelts derived therefrom, and is generally used and recognized as such by the fur breeders, the fur trade and the general public.

47. The name "Topaze" is also claimed by MMBA as a trade-mark for mink pelts. This name is the French form of the English word "topaz". It is formed by simply adding an "e" to the English form of the word. It is generally pronounced as and understood to be the same as the Engish word "topaz".

48. On June 22, 1951, MMBA filed an application to register the name "Topaze" as a trade-mark for mink pelts, claiming that MMBA had first used the name in interstate commerce on May 31, 1951. No registration has issued for this name.

49. Prior to the time of the claimed use by MMBA of the name "Topaze" for mink pelts, the names "topaz" and "topaze" had both been used to designate a particular variety of mutation mink. The name was used on live animals and in the advertising of breeding stock prior to its use on pelts.

50. The English word "topaz", as well as the French word "topaze", means a brown color of yellowish red-yellow hue. This is descriptive of the color of the fur of certain mutation mink, and the word has sometimes been used by MMBA in advertising as a descriptive term for mutation mink fur.

51. The variety of mutation mink known as "topaz" is one of the pastel type of mutations, and there is no term in general use by which this type of mutation mink can be differentiated from other varieties of the pastel type except the term "topaz" or "topaze".

52. Since the topaz mutation of mink is a relatively recent one, it has not been as widely sold or become as well known as the names silverblu or royal pastel. However, the name as used and understood by breeders and in the fur trade, is used and understood in a generic sense to designate a particular variety of mutation mink.

53. The name topaz or "topaze" is the common and generic name for a strain or breed of mutation mink and the pelts derived therefrom.

54. The name "blufrost" is also claimed, and has been registered, as a trade-mark by MMBA for a certain kind of mutation mink pelts and garments as registration Nos. 424, 305 and 429, 974.

55. The variety of mutation mink pelts designated by the name blufrost are no longer of any commercial importance, and the name is consequently not widely used.

56. The name blufrost when it has been used has clearly been used to designate live animals of a particular strain or breed of mutation mink, and clearly is a generic term designating a particular strain or breed of mutation mink.

57. There is no other name known even to those who are well informed in the fur trade, including the officials of MMBA, which could legally be used to designate mutation mink pelts of the kind known as blufrost. The name blufrost is the only available generic name for pelts of that particular type.

58. Midwest has sponsored the sale of mutation mink pelts under the names silverblu and royal pastel.

59. K. T. Orr is in the business of breeding mink and selling the pelts from his mink. He also sells breeding stock. He breeds silverblu mink, royal pastel mink, and topaz mink among other types. He has sold pelts under the names silverblu and royal pastel and he seeks to sell pelts under the name topaz. He has also advertised and offered breeding stock under the names silverblu, royal pastel and topaz.

60. C. A. Noltimier is in the business of breeding mink and selling the pelts from his mink. He breeds silverblu mink and royal pastel mink and has sold the pelts of these animals under such names.

61. MMBA has objected to the use of the names silverblu, royal pastel and blufrost by the plaintiffs, and has effectively prevented the plaintiffs from using those names in connection with mutation mink or mutation mink pelts by its claims of trade-mark rights therein.

62. By claiming and seeking to register the name "topaze" as a trade-mark for mink pelts, MMBA has indicated that it is taking and will take the same position with reference to the use of that name by plaintiffs as it does with reference to the use of the other names mentioned above. Plaintiffs will not be able to sell any pelts through the auction houses, at least, under the name topaz or "topaze" so long as MMBA maintains its claims to the name.

63. There exists a clear controversy between plaintiffs and MMBA regarding the names silverblu, royal pastel and topaz.

64. MMBA also claims the term "EMBA" as a trade-mark. This term is a coined term formed by substituting an "E" as the initial letter in the letters which otherwise stand for the name of the association, M. M. B. A. The term or mark "EMBA" has come in the fur trade to be understood as standing for and representing the Mutation Mink Breeders Association. Plaintiffs do not challenge the validity of "EMBA" as a trade-mark or seek to use that term or mark, and plaintiffs have not used that term or mark.

65. In advertising and sales which it sponsors, MMBA commonly uses its trade-mark "EMBA" along with other designations of the particular mutation pelt which it is advertising or selling.

66. In advertising and sales which it sponsors, Midwest commonly uses its name, or the term "Midwest", along with other designations of the particular mutation pelts which it is advertising or selling.

67. No one could be misled or confused as between mutation mink pelts identified as "EMBA" and those identified as "Midwest" regardless of whether either or both are called "silverblu" or "royal pastel" or some other name identifying the type of fur. No one has ever been misled or confused as between the pelts sold by the plaintiffs and those of MMBA or its members. Such confusion could not and has not taken place. Neither party contends that there is an issue with respect to the marks EMBA and Midwest.

68. MMBA is not in the business of owning or breeding mink or of owning, selling, distributing or dealing in mink pelts or garments. It never owned, sold or commercially dealt in any pelt or garment under the name silverblu or under the name royal pastel.

69. MMBA bases its trade-mark claims upon the activities of its members. The members of MMBA have sold very large quantites of mink pelts under the names silverblu and royal pastel, and somewhat more limited quantities under the name topaz or topaze. No member of MMBA has sold or distributed or is in the business of selling or dealing in mink garments under the names silverblu, royal pastel or topaz or topaze.

70. The names silverblu, royal pastel and topaz as applied to mink and mink fur do not by themselves indicate any source or origin of goods to the general

public, but are accepted by the public as being generic or descriptive names of types of fur.

71. The purpose and effect of the claim by MMBA to exclusive trademark rights in the names silverblu, royal pastel and topaz is to require all mink producers who desire to sell pelts under any of such names to pay a fee or royalty to MMBA for the use of such names by authorizing a percentage deduction from the sales price of the pelts for remittance to MMBA. Any mutation mink producer who does authorize such a payment to MMBA is authorized by MMBA to use such names.

### Conclusions of Law

1. There is an actual controversy between the parties to this proceeding with relation to the claims of trade-mark rights in the terms "silverblu", "royal pastel" and "topaz".

2. This Court has jurisdiction over the parties and the matter in controversy.

■ 3. The names "Silverblu", "Silverblue", "Silver Blu" and "Silver Blue" are all equivalent of each other for the purpose of determining the validity of a claim of trade-mark rights in any one of them.

■ 4. The names "Topaz" and "Topaze" are respectively the English and French forms of one word; and for legal purposes the difference in the forms of this word is immaterial and the two forms are equivalent to each other for the purpose of determining the validity of a claim of trade-mark rights in either.

■ 5. The name "Silverblu" is not and cannot be a valid trade-mark for mink pelts or garments for each of the reasons that:

(a) The name is composed of common English words, spelled phonetically, which are descriptive of the goods.

(b) The name is commonly and properly applied to live mink animals of a particular kind, these animals are reproduction of their own kind, and there can be no valid claim of trade-mark rights in the name of such animals.

(c) The name has been used by others than the trade-mark claimant for similar goods prior to its use with respect to mink pelts or mink garments.

(d) The name is a generic name for a particular strain or breed of mink and the pelts derived therefrom.

(e) The name is the common and popular name for the goods, and does not indicate any particular source or origin of the goods.

■ 6. The name "Royal Pastel" is not and cannot be a valid trade-mark for mink pelts or garments for each of the reasons that:

(a) The name is commonly and properly applied to live mink animals of a particular kind, these animals are reproductive of their own kind, and there can be no valid claim of trade-mark rights in the name of such animals.

(b) The name had been used by others than the present trade-mark claimant for the identical goods prior to the first use of the name by the present claimant.

(c) The name is a generic name for a particular strain or breed of mink and the pelts derived therefrom.

(d) The name is the common and popular name for the goods and does not indicate any particular source or origin of goods.

(e) There is no other name in general use by which these goods can properly be identified.

■ 7. The name "Topaze" is not and cannot be a valid trade-mark for mink pelts or garments for each of the reasons that:

(a) The name is the equivalent of an ordinary English word which is descriptive of the goods.

(b) The name is commonly and properly applied to live mink animals of a particular kind, these animals are reproductive of their own kind, and there can be no valid claim of trade-mark rights in the name of such animals.

(c) The name is a generic name for a particular strain or breed of mink and the pelts derived therefrom.

(d) The name is the common and popular name for the goods and does not indicate any particular source or origin of the goods.

(e) There is no other name in general use by which these goods can properly be identified.

8. The Mutation Mink Breeders Association, defendant herein, cannot properly or legally claim exclusive trade-mark rights in the use of the names "Silverblu", "Royal pastel" or "Topaz" as applied to mink pelts or garments for each of the reasons that:

(a) Said names are not proper trade-marks for such goods for the reasons stated in the foregoing Conclusions of Law.

(b) Said defendant has not itself made a bona fide trade-mark use of said names in commerce.

(c) The members of said defendant, from whom it claims to derive trade-mark rights, have sold breeding stock to plaintiffs and others under these names, and defendant is therefore estopped to claim that such names cannot now be used by those who purchased such breeding stock under such names.

(d) Said defendant has over a substantial period of time consented to the use of such names by many who were legally strangers to it, and has and is, in effect, offering to license and licensing anyone to use said names upon the payment to said defendant of a stipulated royalty or fee. Such practice is an unlawful and improper use of a trade-mark or claimed trade-mark, and amounts to an abandonment of any trade-mark rights that might otherwise exist in any names so used, and creates an estoppel against the assertion of trade-mark rights.

9. The several registrations of the name "silverblu" as a trade-mark by the defendant Mutation Mink Breeders Association were obtained by erroneous and incorrect statements and should be cancelled.

10. Plaintiffs are entitled to the judgment and decree of this Court that:

(A) The Court finds and declares that the name "Silverblu" is not a legal trade-mark, is not the exclusive mark of Mutation Mink Breeders Association, and may be used to describe the appropriate breed, color phase, or color type of mutation mink, mink pelts and mink garments by the plaintiffs and others.

(B) The Court finds and declares that the name "Royal pastel" is not a legal trade-mark, is not the exclusive mark of the Mutation Mink Breeders Association, and may be used to describe the appropriate breed, color phase, or color type of mutation mink, mink pelts and mink garments by the plaintiffs and others.

(C) The Court finds and declares that the name "Topaz" or "Topaze" is not a legal trade-mark, is not the exclusive mark of Mutation Mink Breeders Association, and may be used to describe the appropriate breed, color phase, or color type of mutation mink, mink pelts and mink garments by the plaintiffs and others.

(D) The Court orders that the several registrations by the Patent Office of the name "Silverblu" as a trade-mark of Mutation Mink Breeders Association for mink pelts and mink garments be cancelled.

(E) The Mutation Mink Breeders Association and its officers, agents, successor and assigns be and are perpetually enjoined from:

I. Claiming that the names "Silverblu", "Royal pastel", "Topaz" or "Topaze" are exclusive trade-marks for mink pelts or garments;

II. Preventing or seeking to prevent the use by plaintiffs or others of said names for mink animals, mink pelts or mink garments;

III. Registering or seeking to register said names as trade-marks for mink animals, mink pelts or mink garments;

(F) The Mutation Mink Breeders Association shall give notice to the fur

auction companies by mail and to other segments of the fur trade by publishing once in a trade journal of general circulation in the same manner as its previous advertisements with respect to claimed trade-marks either a full statement or a fair summary of this judgment and decree.

### Additional Findings of Fact and Conclusions of Law.

The Court does hereby make and issue the following additional Findings of Fact and Conclusions of Law:

### Findings of Fact.

72. Plaintiffs have sponsored and advertised the sale of mutation mink pelts under the names Blufrost and Royal Koh-I-Nur.

73. K. T. Orr has sold mutation mink pelts under the names Blufrost and Royal Koh-I-Nur.

74. Mutation Mink Breeders Association has objected to the use of the names Blufrost and Royal Koh-I-Nur by the plaintiffs and sought to prevent the plaintiffs from using those names in connection with mutation mink or mutation mink pelts by its claim of trade-mark rights therein.

75. There exists a clear controversy between the plaintiffs and MMBA regarding the names Blufrost and Royal Koh-I-Nur.

76. MMBA is the owner of the trade-mark Royal Koh-I-Nur and United States Patent Office trade-mark registrations No. 441,368 and No. 442,089 for said mark for a variety of mutation mink as applied to pelts and coats, which fur prior to and at the time of MMBA's adoption of said mark and continuously thereafter, was and is generically known as black cross. The trade-mark Royal Koh-I-Nur is neither a generic term nor descriptive of the variety of fur to which it is applied by MMBA. The use of the trade-mark Royal Koh-I-Nur by MMBA, its members and its licensees has been a lawful and proper trade-mark use by MMBA, and MMBA is entitled to the exclusive use of said trade-mark for mink pelts and coats.

77. MMBA is not in the business of owning or breeding mink or of owning, selling, distributing or dealing in mink pelts or garments, but its members and licensees are, and have been, legitimately and lawfully controlled by MMBA in respect to the nature and quality of the pelts and garments in connection with which said mark is used.

### Conclusions of Law.

11. There is an actual controversy between the parties to this proceeding with relation to the claims of trade-mark rights in the terms "Blufrost" and "Royal Koh-I-Nur".

12. Plaintiffs are entitled to the judgment and decree of this Court that:

(A) The Court finds and declares that the name "Blufrost" is not a legal trade-mark, is not the exclusive mark of Mutation Mink Breeders Association and may be used to describe the appropriate breed, color phase or color type of mutation mink, mink pelts and garments by the plaintiffs and others.

(B) The Court orders that the several registrations by the Patent Office of the name "Blufrost" as a trade-mark of Mutation Mink Breeders Association for mink pelts and mink garments be cancelled.

(C) The Mutation Mink Breeders Association and its officers, agents, successors and assigns be and are perpetually enjoined from:

I. Claiming that the name Blufrost is an exclusive trade-mark for mink pelts or garments;

II. Preventing, or seeking to prevent the use by plaintiffs or others of said names for mink animals, mink pelts or mink garments;

III. Registering, or seeking to register said name as a trade-mark for mink animals, mink pelts or mink garments.

13. The trade-mark Royal Koh-I-Nur, as applied to mink pelts and coats made therefrom, is good and valid in law, and has been infringed by plaintiffs. Registrations in the United States

Patent Office for the trade-mark Royal Koh-I-Nur Registrations Nos. 441,368 and 442,089 are valid and infringed. Said trade-mark Royal Koh-I-Nur and said registrations are the sole and exclusive property of the defendant Mutation Mink Breeders Association.

14. Mutation Mink Breeders Association is entitled to an injunction against the plaintiffs and the officers and members of Midwest Fur Producers Association permanently enjoining and restraining them, and each of them, from using in the production, sale, and advertising of mink pelts and coats made therefrom the trade-mark Royal Koh-I-Nur, or colorable imitations of said mark.

### Judgment.

This cause having come to be heard on the pleadings and proofs, and this Court having considered the evidence and briefs of counsel, and having made its Findings of Fact and Conclusions of Law;

It is hereby ordered and adjudged and decreed by this Court as follows:

1. The Court has jurisdiction over the parties and the matter in controversy.

2. The name "Silverblu" is not a legal trade-mark, is not the exclusive mark of Mutation Mink Breeders Association, and may be used to describe the appropriate breed, color phase, or color type of mutation mink, mink pelts and mink garments by the plaintiffs and others.

3. The name "Royal Pastel" is not a legal trade-mark, is not the exclusive mark of the Mutation Mink Breeders Association, and may be used to describe the appropriate breed, color phase, or color type of mutation mink, mink pelts, and mink garments by the plaintiffs and others.

4. The name "Topaz" or "Topaze" is not a legal trade-mark, is not the exclusive mark of Mutation Mink Breeders Association, and may be used to describe the appropriate breed, color phase, or color type of mutation mink, mink pelts and mink garments by the plaintiffs and others.

5. The name "Blufrost" is not a legal trade-mark, is not the exclusive mark of Mutation Mink Breeders Association, and may be used to describe the appropriate breed, color phase, or color type of mutation mink, mink pelts and mink garments by the plaintiffs and others.

6. That the several registrations by the Patent Office of the name "Silverblu", as a trade-mark of Mutation Mink Breeders Association for mink pelts and mink garments, be cancelled.

7. That the several registrations by the Patent Office of the name "Blufrost", as a trade-mark of Mutation Mink Breeders Association for mink pelts and mink garments, be cancelled.

8. That Mutation Mink Breeders Association and its officers, agents, successor and assigns be and are perpetually enjoined from:

(a) Claiming that the names "Silverblu", "Royal pastel", "Topaz" or "Topaze", or "Blufrost" are exclusive trade-marks for mink pelts or garments;

(b) Preventing, or seeking to prevent, the use by plaintiffs or others of said names for mink animals, mink pelts or mink garments;

(c) Registering, or seeking registration to said names as trade-marks for mink animals, mink pelts or mink garments.

9. The Mutation Mink Breeders Association shall give notice to the fur auction companies by mail and to other segments of the fur trade by publishing once in a trade journal of general circulation in the same manner as its previous advertisements with respect to claimed trade-marks either a full statement or a fair summary of this judgment and decree.

10. The trade-mark Royal Koh-I-Nur and United States Patent Office trade-mark registrations Nos. 441,368 and 442,089, as applied to mink pelts and coats made therefrom, are good and valid in law.

11. The defendant Mutation Mink Breeders Association, its members and licensees have the sole and exclusive right to said trade-mark Royal Koh-I-Nur and said registrations Nos. 441,368 and 442,089.

12. The plaintiffs have infringed said trade-mark Royal Koh-I-Nur and said registrations Nos. 441,368 and 442,-089.

13. The plaintiffs and the officers, agents, successors and assigns of Midwest Fur Producers Association be and each of them are perpetually enjoined and restrained from using in the sale and advertising of mink pelts and garments made therefrom, the trade-mark "Royal Koh-I-Nur", or any colorable imitations of said trade-marks.

14. All other issues raised by the pleadings, not specifically disposed of herein are dismissed without prejudice.