COOPERATIVA DE CAFETEROS DE PUERTO RICO, Plaintiff and Appellant, *v.* F. COLÓN COLÓN, Defendant and Appellee.

No. R-62-92. Decided November 17, 1964.

*Héctor González Blanes* for appellant. *Abelardo Román Font* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The following are the questions to be considered in this case:

(1) Whether or not the registered trade-mark "Café Rico" is valid and effective.

(2) If it is not, whether or not it acquired a secondary meaning which justifies its protection against infringement by appellee F. Colón, competitor of appellant Cooperativa de Cafeteros de Puerto Rico, in the distribution and sale of roasted and ground coffee in the local market.

(3) If said mark actually acquired such meaning we must decide whether the label used by appellee in his coffee bag is so similar to that used by appellant in his, that it actually causes confusion in the market and to the consumers; or whether there exists the reasonable possibility for such confusion.

(4) In case such confusion has been caused, whether defendant's action constitutes unfair competition to the detriment of appellant, which justifies its restraint and the awarding of damages that appellant may have suffered.

Appellant requests that appellee and others be enjoined from packing and trading, using the bags or containers they are using, similar to those used by appellant in its coffee business, or from selling coffee in such containers or

bags because the word "Rico" has been conspicuously displayed using a design and color scheme—red and black—substantially identical to those corresponding to appellant's trade-mark and trade name, which the latter has been using for years and which have become well known to the public and identified with appellant's product so that the presentation or exhibition of such containers causes confusion in the market and to the consumers in general due to the obvious resemblance with the bags in which appellant sells its coffee. It alleges that in this manner appellee profits by and unjustly enriches himself with the credit and good will acquired by appellant's coffee, inducing the public, by means of unfair competition, to buy his product under the mistaken belief that it is plaintiff's product, as well as disturbing and creating dangerous inconveniences to appellant in the conduct of its business. Lastly, appellant alleges that for said reasons it has suffered damages amounting to $100,000, which payment it requests.

Appellee specifically denied the material facts of said complaint and as special defenses alleged, in synthesis, that the registration of the trade-mark "Rico" was illegal, since it is descriptive in nature; that the color scheme red and black is not and could not be part of said trade-mark, since it is an element of mere decorative function and it has been used by appellee prior to appellant and then by all the roasted coffee industry; that the words "Puro de Puerto Rico," which appellant uses and claims as part of its trade-mark, was not included in its registration and it has used it only since a short time ago, and it cannot appropriate it for its exclusive use; that the use, by appellant, of the trade-mark "Rico" for its roasted and ground coffee and "Puerto Rico" for its raw coffee, and its advertising campaign in the papers, radio, and television using said marks and design in a context which illegally imparts to the trade-mark "Rico" a geographical meaning, gives the false and mali-

cious impression to the public that the coffee produced and packed by appellant is the only pure Puerto Rican coffee in the market, which is not true; and thus tends to monopolize the use of the word "Rico" and the pure Puerto Rican roasted coffee industry, causing damage to the other producers, and specifically to appellee; that as a result the sales of coffee decreased during the years 1957–1958, which appellee has been realizing for 16 years in containers with the same color scheme, general appearance and coloring of the container of which appellant complains, in addition to the mark "Flor de Borinquen"; that in order to confront said competition in 1958 appellee modified the label on his container for the sole purpose of making more prominent the words "Café de Puerto Rico" and also made more prominent for easy perception that appellee is the producer of said coffee and the name of the place of production of said coffee; that subsequent to the commencement of this litigation appellant has changed the general appearance of its container eliminating a noticeable difference that existed between litigants' containers, thus increasing any existing possibility of confusion; that in view of the foregoing appellant has not acted in good faith and with clean hands; that appellee's intention was not to pass off his product as appellant's and in order to make the difference between the two containers more noticeable the former has ordered that in his new containers the word "Puerto" be used instead of the abbreviation "Pto." and that his trade-mark "Flor de Borinquen" be printed in larger letters and appellee's name clearer and more perceptible. By way of counterclaim appellee requests that appellant be enjoined from continuing to perform said actions and causing the damages alleged, including those suffered as a result of and while a temporary restraining order requested by appellant against appellee was in effect; that the mark "Rico" be declared null and void, and its registration cancelled; and that appellant be

ordered to pay the amount of $100,000 which appellee claims for damages. Appellant denied the facts alleged in said counterclaim.

After numerous incidents and a lengthy trial in which the parties introduced extensive documentary and oral evidence, the trial court finally dismissed the complaint in this case and declared appellee's voluntary dismissal of his counterclaim with prejudice to the injunction and the order of cancellation of the mark and the registration, and without prejudice as to the damages alleged, through a lengthy and painstaking decision in which it made the following essential findings of fact:

(1) That appellant acquired by purchase and was utilizing the trade-mark "Rico" which registration expired in 1944 without it being renewed.

(2) That in 1948 appellant registered the trade-mark "Rico" with a special design of said word, which registration is still in force and that is the trade-mark to which appellant refers.

(3) That the notices to the public for the registration of said trade-mark and its renewal were made in black ink on white paper without any reference to the color or color scheme of the container; but in the petition for registration appellant presented a facsimile of the special design in black ink on red paper, but the words "Puro de Puerto Rico" did not appear in the advertisements or the facsimiles of the label of said registered trade-mark, which expression appellee claims as his alleged slogan or trade name; nor was it proved how long appellant has been using the words "Puro de Puerto Rico" on said containers to which it has previously referred; that the words "Café Rico" on a white background on the covers of appellant's bags and the phrases on the narrow side of said bag are characteristic of the container which

were not included in the aforesaid petition for registration of the trade-mark or in the aforementioned notices to the public.

(4) That since 1945 appellee has used red containers or bags and the trade-marks "Flor de Borinquen" and "Dilari," which have not been registered; that since 1946 he has been using the color scheme of which appellant complains, except that the words "Puro de Puerto Rico" *were set off as a dominant factor or principal element in a different arrangement of letters and the type size of the trade-mark "Flor de Borinquen" was made smaller.*

(5) That from 1954 to 1958 appellee suffered a reduction in his sales because since he had previously used and sold local coffee mixed with foreign coffee, which mixture the local consumer rejects, the latter continued to connect appellee's product with said mixture and, also, because appellant uses in its advertising the words "Café Rico" in a context which suggests and gives the impression to the public that its coffee is the only pure Puerto Rican coffee; that under this impression appellee considered it necessary to change, and in 1958 he did change the design in the label of the containers, setting forth, conspicuously on the upper part of the containers and in large type, the words "Puro de Pto. Rico," which he had formerly used less conspicuously and without abbreviating the word "Puerto"; that the type, style and letter arrangement of the words "Puro de Pto. Rico," as well as the word "Rico," which is used as part of the geographic name "Puerto Rico" *are different and clearly distinguishable* from the type and arrangement of the word "Rico" in appellant's trade-mark and containers so that any common and ordinary customer who exercises normal prudence and care can easily distinguish one from the other.

(6) That appellee does not use the word "Rico" or the expression "Puro de Puerto Rico" as a trade-mark to identify

his product, but as a part of the geographic name of Puerto Rico in the expression "Café Puro de Puerto Rico," as an ostensible indication to the public that his product is prepared with pure local coffee, using under said expression, in *small type*, but clearly and easily read and distinguished the expression "Marca Flor de Borinquen" and underneath "Roasted and Ground by F. Colón Colón" in larger type, followed by his address in Arecibo.

(7) The word "Rico" when applied to roasted and ground coffee as well as to any drink or food, means that the same is of recognized bounty, flavor, savory, agreeable, very good, for which reason the word is descriptive and also is derived from the common parlance of the Spanish language and of general public use.

(8) That the color scheme red and black, like that used in both parties' bags, and the quality, shape, size and capacity of such containers have been generally used by the roasted and ground coffee producers in Puerto Rico for many years.

(9) That there is sufficient similarity between the general aspect and color scheme of litigants' containers and *there exists the possibility of confusion; but there is no substantial similarity and there are obvious differences*, as those previously related, in the type-size and arrangement of the word of which appellant complains and the width and separation of the black stripes.

(10) That certainly *it is customary to set off the mark or trade-mark of the article in the container or its labels, as dominant element.* In September 1958 when the aforementioned change in the label of his package was made, *appellee departed from this custom, setting forth the trademark "Flor de Borinquen" in smaller type, and, as dominant attribute of the label, the words "Café Puro de Pto. Rico."*

(11) That it is not necessarily inferred from the fact

that in the photographs admitted in evidence some of appellee's coffee bags appear on shelves which seem to be allotted to appellant's bags, that there was error or confusion, because since in the supermarkets the customers serve themselves it may likewise be inferred that said bags were taken and put back on the shelf by the customers without minding which shelf they were returned to.

(12) There is no evidence that the word "Rico" or the special color scheme and presentation of appellant's containers had acquired a secondary meaning before defendant began to use the color scheme and similar presentation of which plaintiff complains, or that it has ever acquired such a meaning, since the mere fact of continued use for a long period of years, although it is an element of evidence of secondary meaning, does not, by itself, prove, and no other element of evidence has been introduced to establish it; that the coloring, color scheme, and general presentation of appellant's container has not been exclusive, since it has been used by appellee for over 14 years without appellant's opposition.

(13) That appellant's practice of advertising "Café de Puerto Rico" jointly with "Café Puerto Rico" without specifying that the former mark is to identify raw coffee only and the latter to identify roasted and ground coffee, and the practice of using the word "Rico," the expression "Rico" with multiple designs, and also the expression "Café Rico" tend to monopolize the use of the word "Rico" in the coffee business and said practice, taken together with the term "Café Rico" and "Café Puro de Puerto Rico" which is used by appellant in its advertising in the newspapers, tends to suggest erroneously that its coffee is the only pure Puerto Rican coffee in the local market.

(14) That appellant has permitted appellee to use the containers now objected to for over 13 years without having presented any objection or tried to prevent its use.

(15) That appellant's objection arises from the fact that appellee *adopted the conspicuous use of the phrase "Café Puro de Puerto Rico" as a prominent and outstanding feature or trait in his container.*

(16) That the evidence on the cases of confusion of litigants' packages has not merited the trust and credit of the court. Although there is the possibility of confusion on the part of careless and thoughtless persons it cannot be concluded that there is reasonable or substantial likelihood of confusion on the part of persons exercising ordinary care.

(17) That the judgment of the District Court of Ponce, now Superior Court, forbidding the use of the trade-mark "Pico" by a Mayagüez producer surnamed Picó, as the trade-mark for his coffee, imitating the special design of letters in the word "Rico" used as appellant's trade-mark, was justified, because the use of "Pico" instead of "Picó" would almost certainly cause confusion in the consuming public, this evidently being a fraudulent use of the surname and the design to pass off his product as appellant's product, thereby infringing the latter's trade-mark.

(18) That appellant's alleged reduction in profits amounting to $82,320 is entirely hypothetical and speculative and if it did exist it might have been caused by other factors.

(19) Similarly, the item of $21,509 increase in additional expenses for the sale of coffee and $46,000 for promotion and to mitigate the damages are also hypothetical and fraudulent and there are no facts in the evidence to justify the imputation that such expenses were made necessary because of appellee's acts.

As conclusions of law the trial court held:

(1) That injunction is an equitable remedy granted only with great caution and in extraordinary cases where the need therefor and the ground for issuing it are clear;

(2) That the trade-mark "Rico" was registered in violation of the provisions of the Trade-mark Act to the effect that no trade-mark shall be registered which consists of words descriptive of articles on which they are used, or of the nature or quality of such articles. (10 L.P.R.A. § 194(e)); consequently the registration is void; (3) That appellant cannot seek the protection of its mark relying on the authority of the Rules of Common Law since they do not govern in Puerto Rico. *People* v. *Superior Court*, 81 P.R.R. 740, 746 (1960); especially when there is a specific provision of law contrary to the Common Law rule; (4) Nevertheless, when a person has adopted and used for a long time a descriptive word to identify his product, he is entitled to protection in equity against the unfair or fraudulent competition of a producer who imitates it for the purpose of passing off his product as someone else's or to cause confusion or to deceive the public. For such purposes it is necessary that, prior to defendant using it, the mark should have acquired a secondary meaning which in the mind of the public connects it exclusively with plaintiff's product, and that the defendant uses or imitates it to pass off his product as appellant's; (5) That in determining whether there is unfair competition the courts should weigh the conflicts of interest and whether it is defendant's fraudulent intention to take possession of plaintiff's business or whether it will be, necessarily or with reasonable probability, the result of defendant's actions; and the evidence of illegal or dishonest behavior must be clearly reasonable. In this case the court understood that appellee's behavior was justified and it does not appear from his actions that he had the fraudulent intention in question; that the change he made in the label of his product in 1958 did not alter the general appearance of the package he had used in the market for years without appellant's opposition, and it was intended to set forth before the public in a conspicuous

manner that his coffee was pure Puerto Rican coffee; (6) That the court, under the guise of protecting the mark "Rico" from unfair competition could not incur in the paradox of holding that appellant may not acquire the monopoly over the word or color scheme through registration and at the same time grant said monopoly on the ground of its long-time use; (7) That the secondary meaning attributed to the trade-mark "Rico" has not been proved; (8) That because of the mere possibility that there are careless persons who do not exercise adequate observation when shopping may become confused, the court is not justified in forbidding appellee from using the containers objected to by appellant. Comparing both containers, the court believes that only a thoughtless or careless purchaser may become confused; it is sufficient that the producer maintains a noticeable difference for a thoughtful and careful person, and sets forth, with reasonable clarity and certainty, the origin of the article, as appellee does; (9) That the case of *Eneglotaria Medicine Co.* v. *Sosa*, 38 P.R.R. 542 (1928) may be distinguished because in that case there was clear evidence of priority in the use by plaintiff and of the existence of secondary meaning; in the case at bar neither one nor the other has been clearly established; furthermore, appellee did not use the word "Rico" as a trade-mark distinguishing his product and informing the public of the name of the manufacturer and place of manufacture. Furthermore, appellee's design of the word "Rico" is different from appellant's; in *Eneglotaria, supra,* the parties were in "pari delicto" using a geographic name, while in this case appellant relies on a descriptive word claiming its monopoly, while appellee uses it as part of the geographic name of the place of production of the coffee he uses for his product and not as a trade-mark; nor were the circumstances of the use of colors in litigants' containers—colors of general use—involved in *Eneglotaria, supra*; in *Eneglotaria, supra,* the trial court

decided that defendant had set out deliberately to imitate the product of the complainant and so was guilty of unfair competition, which could not be inferred in this case from defendant's actions or from the facts related thereto; and there did not exist in said case the laches and lack of clean hands that the court charges against appellant and which consisted in: (a) that he did not complain of appellee's use of the container for 14 years; (b) that the relief sought tends to create a monopoly; (c) that it modified the container subsequent to the commencement of the suit, thereby increasing the probability of error and confusion in the public; and (d) the use of the mark "Rico" and "Café Puerto Rico" and the other allegations in the complaint, all of which convinces the court that appellant has not acted with clean hands, and, therefore, it should be deprived of any right it might have to seek injunction. (10) That it was not proper to award damages claimed by appellant because (a) the damage suffered would be *damnum absque injuria*; (b) appellant incurred laches in permitting, with its passiveness, that appellee retain the color and general presentation of his wrapper which he had been using for many years, when he made the change in the label; (c) appellant's behavior is indicative of lack of clean hands; and, lastly, (d) the damages it has sought to prove are hypothetical and speculative.

Appellant charges the trial court with the commission of seven errors, namely:

"(1) in dismissing the complaint, notwithstanding the unfair competition pointed out by defendant's actions; (2) in deciding that the registration of the trade-mark 'Rico' for the roasted and ground coffee, produced and sold by plaintiff, is void; (3) in denying plaintiff the protection of the trade-name utilized by it for over thirty-six years; (4) in deciding, against a proven physical fact—which are the bags themselves—that the resemblance between the bag offered in the market by

defendant and that registered and continuously used by plaintiff since 1936, *is not substantial* and that 'there exist other dominant differences'; (5) in deciding, *without any evidence in support thereof* that plaintiff has performed acts tending to make its container—which it has used since 1936—to resemble more the container of which it complains and/or that with its actions it has increased the confusion, as well as that plaintiff has appeared in court with 'dirty hands,' being 'guilty of laches for twelve or more years'; (6) in deciding that defendant has suffered recoverable damages; and (7) in ordering plaintiff to pay $3,500 for attorney's fees." ·

We shall consider the first error in last instance, and the others in the same order they have been assigned in the fourth paragraph of appellant's petition for review.

■ 1. We agree with the trial court that the term "Rico" in appellant's trade name is descriptive, and by virtue thereof the trade name which appellant seeks to protect in this case is not recordable pursuant to the provisions of § 4 subd. (e) of the Trade-Mark Act now in force (10 L.P.R.A. § 194 (e) ).[1] It has been decided that the following terms are descriptive:

(a) *"Nu-Enamel,"* in relation to enamels that appellee manufactures and sells. *Armstrong Co. v. Nu-Enamel Corp.,* 305 U.S. 315, 334 (1938).

(b) *"Lift Truck Parts & Service, Inc.," Lift Truck Parts and Service, Inc. v. Bourne,* 385 P.2d 735 (Ore. 1963).

(c) *"Dry Fry"* used in relation to a substance for treating pans for oilless cooking. *E. F. Drew & Co. v. Pam Industries, Inc.,* 299 F.2d 777 (7th Cir. 1962).

---

[1] "No trade-mark shall be registered which consists:

" . . . . . . .

(e) Of words descriptive of articles on which they are used, or of the nature or quality of such articles, or simply of a name or geographical term." Section 4 subdivision (e) of the Trade-Mark Act. See, also, the recent article of Professor Santa-Pinter, *Registration of Trade Marks in Puerto Rican and Argentine Law,* Rev. Der. Puertorriqueño No. 9, 1963, *Universidad Católica de Ponce,* pp. 55, 61, 62.

(d) *"Tub-Kove,"* in relation to flexible sealing strips for use in sealing spaces around bathtubs. *Keller Products* v. *Rubber Linings Corp.,* 213 F.2d 382 (7th Cir. 1954).

(e) *"Silverblu," "Royal Pastel," "Topaze"* and *"Bluefrost,"* in relation to mink pelts or garments as words descriptive of a particular kind of live mink animals. *Midwest Fur Producers Ass'n* v. *Mutation Mink B. Ass'n,* 127 F. Supp. 217 (D.C. Wis. 1954).

(f) *"Nu Grape,"* in relation to a drink, because it consists of the word "new" misspelled and "grape." *National Nu Grape Co.* v. *Guest,* 164 F.2d 874 (10th Cir. 1947).

(g) *"Raisin Bran,"* in relation to a cereal. *Skinner Mfg. Co.* v. *General Foods Sales, Co.,* 52 F. Supp. 432 (1943).

(h) *"Hot Patch,"* in relation to portable repair vulcanizer and tools for tire repair. *Shaler Co.* v. *Rite-Way Products,* 107 F.2d 82 (6th Cir. 1939) ; *Speaker* v. *Shaler Co.,* 87 F.2d 985 (7th Cir. 1937).

(i) *"Lilas de France,"* in relation to a perfume. *Pinaud Inc.* v. *Huebschman,* 27 F.2d 531 (2d Cir. 1928), *cert. denied,* 278 U.S. 644.

(j) *"Notaseme,"* in relation to seamless hosiery since it used a corrupted description thereof. *Straus* v. *Notaseme Co.,* 240 U.S. 179 (1916).

We conclude—on better grounds than in the previous cases—that in the case at bar the term "Rico" is descriptive since it is generally used in relation to beverages or foods to mean that they are tasty, delicious, pleasant, or very good.

■ ■ 2. We have adopted in Puerto Rico the doctrine of secondary meaning to which the trial court refers and acknowledges. Before proceeding, it is necessary to explain what is meant by said doctrine. In *G. & C. Merriam* v. *Saalfield,* 198 Fed. 369 (6th Cir. 1912), it was concisely defined as follows:

"It [secondary meaning theory] contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning."

As stated by commentator Callmann in his book, III Unfair Competition and Trade-Marks 1223 and 1224, § 77.1 (2d ed.), "Out of the businessman's efforts and the public recognition of this secondary meaning there arises a new property right which will be entitled to protection." In III Restatement of the Law, Torts, § 716, Comment (b) p. 560, it is stated that the phrase secondary meaning means rather a subsequent significance added to the previous meaning of the designation and becoming in the market its usual and primary significance, and it adds: "The issue in each case is whether or not in fact a substantial number of present or prospective purchasers understand the designation, when used in connection with goods, services or a business, not in its primary lexicographical sense, but as referring to a particular person or association." We cited said doctrine in *Eneglotaria Medicine Co., supra.*

■ The determination of whether a descriptive word or phrase used to designate an article in the market has acquired a secondary meaning is a question of fact.

In *Armstrong Co., supra*, it was said that the mark "Nu-Enamel," although descriptive, had acquired a secondary meaning due to its use in the numerous other articles of respondent's manufacture, in its advertising, on store window valances, on electric and other displays, as the name of many stores and the sign of several thousand dealers and "This establishes, entirely apart from any trade-mark act,

the common law right of the Nu-Enamel Corporation to be free from the competitive use of these words as a trade-mark or trade name . . . this right of freedom does not confer a monopoly on the use of the words. It is a mere protection against their unfair use as a trade-mark or trade name by a competitor seeking to palm off his products as those of the original user of the trade name. This right to protection from such use belongs to the user of a mark which has acquired a secondary meaning. He is, in this sense, the owner of the mark . . . . When a name is endowed with this quality (secondary meaning), it becomes a mark, entitled to protection."

In *Lift Truck Parts & Service, Inc., supra,* it was said that the following evidence supported the conclusion that the name in question had acquired a secondary meaning:

(a) A survey poll conducted by a private research company among persons requiring service and parts for "lift trucks." Approximately twenty percent (20%) of the estimated potential market was interviewed. It is not necessary that the persons interviewed be summoned to testify.[2]

(b) The length of time that plaintiff had used its name.

(c) The volume of advertising in connection with plaintiff's name.

(d) The relatively concentrated public with which the parties were dealing.

■ In *Keller Products, supra,* it was decided that although the mark "Tub-Kove" was descriptive, it had acquired a secondary meaning on the basis that prior to the commencement of the suit plaintiff had spent in excess of $42,000 in advertising its product introduced in the market; that the product had received considerable free advertising

---

[2] In relation to these surveys, see *Standard Oil Co.* v. *Standard Oil Co.,* 252 F.2d 65 (10th Cir. 1958), and the annotation entitled *"Admissibility and weight of surveys or polls of public or consumers' opinion, recognition, preference, or the like,"* 76 A.L.R.2d 619.

in trade magazines and papers; that the product was well received by the public; *that the evidence must be considered favorable to plaintiff*; that one who makes use of another's trade-mark has the burden of justifying such use and of showing that his right has been exercised with reasonable regard to the rights of the owner of the other mark.

 It has been said that establishing a secondary meaning depends on an association by the public with a particular though possibly anonymous source. Judge Learned Hand has phrased the determinative factual issue in these cases as follows: "What do the buyers understand by the word for whose use the parties are contending?" *Bayer Co.* v. *United Drug Co.*, 272 Fed. 505 (D.C. N.Y. 1921). So that the thoughts of the public relating to the use of a term is the commonly articulated method of determining the attainment of a secondary meaning. For the purpose of supporting the existence of secondary meaning the testimony of typical users of the class of goods involved is often introduced into evidence. This manner of establishing the secondary meaning is called the *association* test. Extensive use has also been made of indirect evidence which provides grounds on which to base a presumption of user identity by the party asserting the word to be protectable. Evidence of this type includes the amount and manner of advertising, duration of exclusive use and volume of sales. Another manner of establishing the secondary meaning has been utilized, that is, on the basis of evidence that the trade-mark has become a valuable business asset, with little regard given to source association by the public. Resort to this method is had because of the difficulties in using the former, since under the former the determination greatly depends on the conflicting testimonies of the consumers called as witnesses by both parties. To that effect many courts give consideration to the duration of use, advertising, sales volume and the expended

effort rather than to consumer association.[3]

*Trade-Marks Secondary Meaning—Lack of Uniformity in Determining Secondary Meaning*—47 Iowa L. Rev. 781 (1962); *The Doctrine of Secondary Meaning*, 62 W. Va. L. Rev. 254 (1960); *Time as an element in determining whether a descriptive term has acquired a secondary meaning entitling it to protection against unfair competition*, 40 A.L.R. 433.

In *Shaler Co., supra*, it was held that the phrase "hot patch" had acquired a secondary meaning since "there was evidence that for many years the appellant had used the words 'Hot Patches' extensively in connection with its merchandise; had spent large sums of money putting its products on the market; had established a nation-wide field of activity, accumulating numerous dealers in its products, and had introduced feature advertising stressing the words 'Hot Patches'."

In *Eneglotaria Medicine Co., supra*, we said, to that effect, that the trade-mark "Alcoholado Porto Rico" had acquired a secondary meaning on the basis of the following facts established by the evidence:

"That in 1923 the complainant commenced to sell on this Island a bay rum or *alcoholado* with the name of 'Alcoholado Porto Rico' printed or displayed on the labels which are affixed to the containers of the product which was manufactured from a recipe belonging to the said complainant; that the *alcoholado* of the complainant is made and manufactured by the Eneglotaria Medicine Co. of New York City.

---

[3] *The Doctrine of Secondary Meaning, supra*, points out three limitations and conditions in relation to the secondary meaning theory, namely:

(a) If the word, phrase, or mark was unlawfully appropriated, the existence of a secondary meaning is no justification for its continued use, and such unlawful user will be enjoined.

(b) The exclusive right to use the word, phrase, or mark only extends to the area of its popularity; and

(c) Secondary meaning cannot extend to the area of functional features of a product.

"That at that date (1923) the product was unknown in Porto Rico and that the appellant began a campaign to open up and assure itself of a market, which said campaign continued until the filing of this suit and from which it obtained large sales.

"That the product became known to the public as 'Porto Rico' or 'Alcoholado Porto Rico'."

In *Armstrong Co., supra*, it was also stated that "The facts supporting a suit for infringement [of registered trade-mark] and one for unfair competition [for the use of an illegally registered trade-mark] are substantially the same."

█ In the case at bar the trial court erred in reaching the conclusion that the secondary meaning attributed to the trade-mark "Rico" had not been proved. We have painstakingly examined the record of the oral and documentary evidence admitted at the hearings of the case and in our judgment it was fully established that the color scheme, design and words "Café Rico" in the label of appellant's bag have acquired a secondary meaning in the market of roasted and ground coffee in Puerto Rico as a result of the following circumstances:

(a) In 1936 appellant acquired by purchase the trade-mark "Café Rico" registered in Puerto Rico and the trade-mark "Rico" registered in the United States Patent Office, and it has continuously and ostentatiously used it since then, except that in 1948 it registered said mark with a special design printed on the bags in which it packs and sells its roasted and ground coffee, which it had been utilizing ever since for said purpose, a sample of which appears in Exhibit 1 of this opinion.

(b) Appellant's roasted and ground coffee has been identified with said bag by the trade and public, appellant having sold in said containers about six million pounds of said

product a year throughout the Commonwealth of Puerto Rico.

(c) That in order to develop that market and reach the amount of such sale, appellant has established a roasting coffee plant in Ponce and another in San Juan and has established an organization to cover the whole island, and a promotion and advertising campaign at a cost of more than $100,000 a year. The product is sold throughout Puerto Rico, in markets, supermarkets, stores, and businesses. The claimant zealously watches the sale of this product and for that purpose it always maintains a good advertising campaign, good personnel and a fine group of coffee dealers in Puerto Rico. It sells more or less 30% of the roasted and ground coffee consumed in Puerto Rico.

3. Having established that the trade-mark "Café Rico" in the label utilized by appellant since 1948 has acquired a secondary meaning and, so, must be protected against unfair use by a competitor, we must now determine whether appellee actually committed the unfair practice of which appellant complains. The trial court decided that the resemblance between litigants' coffee bags is not substantial and that there are marked differences between the labels on the bags of each one of them; that although there exists the possibility of confusion between both bags it cannot be concluded that there is reasonable or substantial likelihood of confusion on the part of persons exercising ordinary care; that the evidence on the confusion cases has not merited the trust and credit of the court. Undoubtedly, on the basis of what was stated in paragraph 5 of the preceding summary of the findings of fact of the trial court, the latter decided that appellee's behavior was justified, and it does not appear from his actions that he had the fraudulent intent or that his conduct was unfair and dishonest as to warrant the decision that he had performed an unfair competition against which appellant must be protected.

In order to decide, it is necessary to make a brief summary of the state of law in relation to said question.

■ Although the weighing by a trial court of the oral testimony merits our greatest respect and consideration, it is nevertheless true that in the weighing of the documentary evidence this Court is in the same position as the trial court. *Central Igualdad Inc.* v. *Sec. of the Treas.*, 83 P.R.R. 44 (1961).

In *Harold F. Ritchie, Inc.* v. *Chesebrough-Pond's Inc.*, 281 F.2d 755, 757 (2d Cir. 1960), it was stated that "Each case alleging trademark infringement must be judged on its own facts, and citation of authorities is not very helpful, except insofar as they show the general pattern." The decisive test is the question of fact in relation to the possibility of confusion by an ordinary buyer who exercises ordinary prudence in buying the goods in controversy. *Nebraska Consol. Mills Co.* v. *Shawnee Milling Co.*, 198 F.2d 36 (10th Cir. 1952).

In *Eneglotaria, supra,* in deciding that defendant was guilty of unfair competition in selling in Puerto Rico his bay rum under the trade-mark "Gloria de Puerto Rico" since 1924 when plaintiff was selling, in said jurisdiction, his *alcoholado* under the trade-mark: "Alcoholado Porto Rico", since 1923 we said: "*[T]he general color scheme, of the two labels is similar enough to deceive a person who had had no experience with either of the two bottles, or did not have them placed side by side, although the two drawings are entirely distinct and the colors have very marked differences;* that if a person who was using "Alcoholado Porto Rico" had shown it casually to someone else and recommended it, the person to whom the recommendation had been made could be readily deceived on asking for "Alcoholado Porto Rico." (Italics ours.)

In *Jackson Brewing Co.* v. *José B. López, Succrs.*, 51 P.R.R. 697 (1937) we affirmed the decision by virtue of

which defendant was permanently enjoined from using the word "Jax" anywhere on its labels or cartons in any way associated with the sale of its beer in Puerto Rico, notwithstanding it is sold under the mark "Royal Palm," because in its label there appeared the phrase "Jax Brewing Company, Jacksonville, Florida," and the evidence "perhaps not as clear as it might be, tended to show that sellers of the principal agent of the plaintiff [Jackson Brewing Co. of Louisiana, which sold its beer in Puerto Rico under the trade name 'Jax'] found difficulty in selling its beer because the persons approached claimed to have a cheaper beer proceeding from Jackson Brewing Co.," that "From the evidence it appears that there was danger of injury to the petitioner's reputation, that the defendant's use of the monosyllable 'Jax,' even though in connection with its corporate name, carried with it a probability that when sold in cartons (wholesale), . . . retailers might be deceived into thinking that both products were made by the same brewer and thus purchase the one on the reputation of the other."

In *Kellogg Co.* v. *Nat. Biscuit Co.*, 305 U.S. 111 (1938) a decree was vacated enjoining defendant from the use of the words "shredded wheat," among other reasons, because said words and a design of the product were used in good faith. Both litigants' product was sold in cartons which were distinctive in size, form and color; the differences in the labels were striking, prominently bearing the name of the producer. *Nevertheless, Kellogg Co. was enjoined from using the picture of two shredded wheat biscuits in a bowl of milk on the grounds that they were similar to those in plaintiff's registered trade-mark.*

In *Straus*, *supra*, Justice Holmes decided that using the mark "Irontex" upon the trade-mark "Notaseme" was unfair competition; that using a similar label was unfair competition. There was absence of evidence that any deceit or substitution was accomplished in fact.

In *Arnold, Schwinn & Co.* v. *Evans Products Co.*, 302 F.2d 765 (1962), it was said that respective trade-marks must be considered in their entireties in determining whether a defendant's mark when applied to its goods is likely to cause confusion or mistake or deception of purchasers because of its similarity to a plaintiff's mark. When designs are similar and words dissimilar, the matter of which of the two features dominates the mark is usually controlling in determination of question of likelihood of confusion.

In *Q-Tips, Inc.* v. *Johnson & Johnson*, 206 F.2d 144 (3rd Cir. 1953) it was stated that one of the factors to consider is the intent of the actor who adopts the designation objected. In this case defendant formerly put out a product called "Cotton Tipped Applicators." It was descriptive and non-appealing. The matter was submitted to an advertising agency. Many names were suggested completely unlike anything suggested by the product. In the end "Cotton Tips" was adopted. It was decided that it was clear why, with all the possibilities open to it, defendant made this choice. "Tips" had never been used as part of a trade-mark for this product until plaintiff coined "Q-Tips," a product which enjoyed tremendous popularity under said mark to the extent that plaintiff was making 90% of the prepared swabs in the United States. The evidence was convincing that defendant made its choice of "Cotton Tips" in order to come as close as it thought legally possible to "Q-Tips" and bask in the reflected popularity of plaintiff's name.

In *Keller Products, supra,* it was stated that although the color and design of the marks were not identical when viewed in their entirety, defendant's use of the dominant features of plaintiff's mark was immediately apparent. In this case no evidence was introduced to prove that in purchasing defendant's kit anyone was deceived by defendant's design into the belief he was purchasing plaintiff's kit. It was said that it was not necessary to show actual cases

of confusion but the *test is whether there is likelihood of such confusion. It is sufficient that the trial court understand that deception would be probable result of defendant's acts. Independent Nail & Pack. Co.* v. *Stronghold Screw Products,* 205 F.2d 921 (7th Cir. 1953) ; *Esso Inc.* v. *Standard Oil Co.,* 98 F.Supp. 1 (8th Cir. 1938) ; *Esquire Inc.* v. *Maira,* 101 F.Supp. 398 (D.C. Pa. 1951) ; *Majestic Mfg. Co.* v. *Kokenes,* 67 F.Supp. 282 (D.C. Ala. 1946).

In *B. Di Medio & Sons* v. *Camden Lumber & Millwork Co.,* 93 A.2d 45 (N.J. 1952) it was decided that in an action to restrain use of trade-mark because it infringes a descriptive trade-mark which has acquired a special trade meaning, plaintiff need not prove that defendant used the name with premeditated intent to injure plaintiff or to deceive the public; it is sufficient if the consequences of defendant's acts predominate over the quality of his motive.

In *Independent Nail & Pack. Co., supra,* it was stated that in order to constitute infringement of a trade-mark, it is not necessary to copy an entire trade-mark, but the imitation need only be slight if it attaches to what is salient, and it is sufficient if one adopts a trade-mark or trade name so like another in form, spelling, or sound that one, with a not very definite or clear recollection as to the real trade-mark, is likely to become confused or misled; that it is not necessary that a plaintiff show actual cases of confusion, but test is whether there is likelihood of such confusion because of the similarity.

In *Time, Inc.* v. *Life Television Corp.,* 123 F.Supp. 470 (D.C. Minn. 1954), it was pointed out that in cases of the aforestated nature any *doubts as to adequacy of proposed remedy would be resolved against defendant.*

By judgment rendered in *Cafeteros de Puerto Rico* v. *Picó,* Civil Case No. T-1891, The Superior Court, Ponce Part, decreed an injunction to enjoin the use of a paper bag in

relation to the sale of roasted and ground coffee because said container was similar in color and design to that which appellant seeks to protect in this case, except that in the former the word "Café" was used placing underneath it the word "Pico."

4. We shall consider now whether there was actually the possibility of confusion which may serve as a basis to establish a case of unfair competition. In Exhibit I which has been attached as part of this opinion there appear the labels of the bags in which the parties sold their coffee in the market in Puerto Rico, and which are in issue herein. As pointed out by the trial court, appellee changed his previous design in which like many other competitors in the roasted and ground coffee business in the market of Puerto Rico, he set off with great prominence his mark "Flor de Borinquen" and in which the words "Puro de Puerto Rico" appeared printed in much smaller type. The change consisted in placing uppermost in the label the words "Café Puro de," underneath thereof the letters "Pto." and below, covering the greater part of the space in red, the word "Rico" printed prominently and slanted across said space. From the samples of bags used by different roasted and ground coffee producers in Puerto Rico which were admitted in evidence, it appears that although red and black are generally used by many of them, none contains the imitation of appellant's bag, which is apparent in appellee's, the others showing, contrary to appellee's, special care in distinguishing their designs as well as in making their respective marks conspicuously prominent. None of them has the strong similarity with appellant's bag that appellee has attained in his, and none of them has followed the special arrangement to make difficult and relegate the producer's trade name to a secondary position and instead set off prominently the word "Rico." Although unnecessary, some oral

evidence was introduced in relation to the existence in the local market of actual and effective confusion between litigants' bags, which merits credibility in weighing it jointly with the photographs contained in the record of the shelves, in which the coffee bags of both parties appear mixed with each other, either by the consumers or by the store employees, who, undoubtedly, did not realize, in the ordinary course of their activities, the existing differences between both wrappings, and, on the contrary, must have been confused by the similarity between the bags which, in our judgment, was substantially greater than that which gave rise to injunction in *Eneglotaria, supra*; *Jackson Brewing Co., supra*; *Straus, supra*; *Q-Tips, supra*; and *Cafeteros de Puerto Rico* v. *Picó Hermanos, supra*. The fact that after its trade-mark was registered appellant modified its bag, first to add in the cover, repeatedly, the words "Café Rico" on white background, other prints on the sides, and, after filing the complaint, to add a label or white sticker on the bottom of its bag with the words "Café Rico" printed in black, does not alter the reality that there exists such a marked similarity between both bags that there is the possibility of confusion between litigants' products in the market and that one product may be bought for the other. These changes rather tended to differentiate even more the wrappings in question and not to emphasize the similarity, as the trial court decided. Our examination of the record and the documentary evidence admitted in this case, lead us to the conclusion that appellee changed the label on its bags for the purpose of increasing its sales, which had been decreasing during the years prior to 1958, and for said purpose, in making the word "Rico" prominent within a design very similar to appellant's, evidently he tried to take advantage of appellant's good will, of the favor which, in his judgment, as stated by the trial court, the trade-mark "Café Rico" was enjoying in the market. These circumstances are similar to those in

*Q-Tips Inc., supra.* Pursuant to the decision in *Time, Inc., supra,* the conclusion is inescapable that appellee set out with the purpose of trading upon appellant's established trademark and label on appellant's bags for the purpose of increasing his sales through the unfair exploitation of appellant's good will and that "A finding of a likelihood of confusion under such circumstances is abundantly supported by the authorities."

5. The trial court erred in deciding that appellant is not entitled to any equitable remedy whatsoever because of his delay in requesting it and his behavior indicative of lack of clean hands.

Said court bases its decision on appellant's negligence in permitting appellee to use containers with same color combination and general presentation, "which made appellee confident that he could use them and keep them as he did when he modified the label in 1958 giving great prominence to the expression 'Café Puro de Pto. Rico.'" The evidence shows a clear case of progressive infringement which culminated in said change performed by appellee in 1958 which gave rise to appellant's immediate request by letter addressed to appellee asking him to desist from said change and which gave rise, some time later, to the filing of the action in this case considering that appellee did not modify his actions in any manner whatsoever, *Independent Nail & Pack. Co., supra, Rothman* v. *Greyhound Corporation,* 175 F.2d 893 (4th Cir. 1949). So that actually it cannot be concluded that appellant was guilty of the alleged delay but that, on the contrary, it was diligent in seeking the protection of its right.

There is no ground either to decide that appellant's behavior shows lack of clean hands because of the change made in its mark after filing the action, as we previously explained, or because the use of the trade name "Rico" sug-

gests that appellant's coffee is "the only pure Puerto Rican coffee in this market," or because the mark "Café de Puerto Rico" in relation to raw coffee in addition to the mark "Rico" for the roasted and ground coffee, tends to monopolize the use of the word "Rico" in relation to the coffee market, or because the design, label, and color scheme of the registered mark "Rico" are different from those cited in the case, or because the mark had expired, or because it alleged the unfair use of the word "Rico" by appellant, isolating it from the abbreviation "Pto." which precedes it, or because it seeks to use a descriptive word and a color scheme which are of public domain. There is nothing in the record to support these conclusions or show lack of clean hands on the part of appellant to justify the denial of the equitable remedy requested.

6. As to the damages suffered by appellant we agree with the trial court that the items alleged by appellant for which evidence was received are hypothetical and speculative, since the evidence shows that appellant's sales as well as its profits have progressively increased and it was not shown that, in effect, the failure to reach the sales limit, and therefore obtain the corresponding profit which appellant sought to attain was the result of appellee's actions to which appellant objected. The same may be said as to the increase in additional selling expenses and for advertising promotion and mitigation of damages.

7. It is obvious from the preceding recital that the trial court erred in dismissing the complaint and in ordering appellant to pay attorney's fees (errors 1 and 7 previously related).

Therefore, the judgment of the trial court will be reversed, the complaint will be sustained instead and, by virtue thereof, a writ of injunction will be issued permanently restraining appellee, his agents and employees, successors or assignees from continuing to use the container objected to

unless modified to conform to the practice established.in the coffee market of Puerto Rico, as for example, making appellee's mark "Flor de Borinquen" to appear prominently in the main label on its bag as well as on the sides, top and bottom, although he may keep the phrase "Café Puro de Puerto Rico" printed in some place on the label, underneath said mark, in regular size type, a little larger than those previously used by appellee for said purpose. Appellee will be ordered to pay the costs including those for this review, as well as attorney's fees for the amount of $1,000.