255 F.Supp. 771 (1966)
SWEETARTS, Plaintiff,
v.
SUNLINE, INC., and Menlo F. Smith, Defendants.
No. 64 C 226(2).
United States District Court E. D. Missouri, E. D.
June 21, 1966.
*772 M. H. Hartwell, Jr., Portland, Or., Edward A. Boeschenstein, St. Louis, Mo., for plaintiff.
Ralph W. Kalish, St. Louis, Mo., for defendants.

MEMORANDUM
MEREDITH, District Judge.
This matter was tried to the Court and the Court makes the following findings of facts and conclusions of law:
Plaintiff Sweetarts is an Oregon corporation, having its principal place of business in Portland, Oregon. Defendant Sunline, Inc., is a Missouri corporation, having its principal place of business in St. Louis, Missouri. Defendant Menlo F. Smith is a resident of St. Louis County, Missouri, and is president of Sunline, Inc. Plaintiff instituted this suit for infringement of a trademark registered in the United States Patent Office and for unfair competition. This Court has jurisdiction under 28 U.S.C. § 1338 and by virtue of diversity under 28 U.S.C. § 1332.
Sweetarts Company, a partnership, predecessor of the plaintiff, was started in 1926 in Dundee, Oregon. At that time it was engaged in the manufacture of glazed and candied fruits, including stuffed prunes. In the 1930's the firm included chocolate-covered nuts and butter toffee in its merchandise for sale.
Sweetarts Company applied for the registration of the trademark "Sweetarts", in May 1928. Trademark certificate No. 242,227, covering the registration of the trademark, was issued to it for use in connection with "dried prunes, in Class 46, foods and ingredients of foods". The original mark registered showed two heart-shaped drawings with the word "SweeTartS" running through the two hearts, underneath which word and also within the hearts appeared the word "sweet-tart". Plaintiff, the successor to Sweetarts Company, applied for and received a renewal of the original registration in 1948 also for use in connection with "dried prunes, in Class 46, foods and ingredients of foods".
In 1930 Sweetarts Company moved from Dundee to Portland, Oregon. The business was purchased in 1947 for $30,000 by the present plaintiff, an Oregon corporation. The purchase included inventory, store building and equipment, the name "Sweetarts", and all the assets of the business. During 1942, because of the war, there was a shortage of sugar and Sweetarts Company, predecessor to the plaintiff, discontinued the making of glazed fruits and the stuffed candied prunes which they had made previously. Since 1942 neither the plaintiff nor its predecessor has used the name "Sweetarts" in connection with stuffed or dried prunes. There is no evidence in the record that the name "Sweetarts" was ever used in connection with prunes separately, whether dried, candied or stuffed, but stuffed prunes were included in boxes of glazed and candied fruits, which were sold during the period 1926 to 1942 by plaintiff's predecessor.
Between 1926 and 1947 the extent and area of sales made by plaintiff's predecessor is rather indefinite. It appears to the Court that butter toffee, nuts and mixed chocolates were sold in the States of Washington and Oregon, with a few sales outside of these states to individual companies. From 1926 to 1942 glazed fruits were sold in the same places. *773 Sales were made during the period 1926 to 1947 to fraternal or charitable organizations, such as Job's Daughters and the Rainbow Girls, for fund-raising purposes.
In excess of ninety percent of plaintiff's sales since July 1, 1947, have consisted of butter toffee; the remaining portion of the sales are mixed chocolates. The butter toffee is sold in bulk and packaged in cardboard containers of nine and one-half ounces and in tins of fourteen ounces. The unpackaged bulk sales were made to grocery stores and had no markings. The cardboard packages have the name "Sweetarts" appearing on the box and inside the box the toffee is wrapped individually with a transparent cellophane with no marking on it. The tins have the name "Sweetarts, Portland, Oregon" on a sticker placed on the bottom of the tin. The nine and one-half ounce box is sold to the consumer for $1.00 and the fourteen ounce tin for $1.35. The mixed chocolates are boxed in gift-wrapped containers for sale to the consumer at prices between $1.70 and $7.70, and have a sticker placed on the bottom of the box with the name "Sweetarts" shown on the sticker. The labels used on the containers have the expression "Trademark registered U. S. Patent Office." Sales of butter toffee through Job's Daughters of Oregon were in pasteboard boxes of nine and one-half ounces, but did not have the name "Sweetarts" on the box. Sales through Job's Daughters (except Job's Daughters of Oregon) did have the name "Sweetarts" on the box. All sales of butter toffee through Job's Daughters, whether marked with the name "Sweetarts" or not, were in purple and white boxes (the colors of the organization) which bore the notation "Made for Job's Daughters".
At some period of time from 1947 to the present time, a small amount of butter toffee was sold in plastic containers, bearing the name "Sweetarts", for thirty-nine cents each and a butter toffee bar which sold for ten cents and had the name "Sweetarts" thereon. These items were sold through drugstores and grocery stores. They were not successful and have been discontinued.
Plaintiff's president testified that from July 1947 to May 1965 its total sales of butter toffee and chocolates, with the name "Sweetarts" on the box labels, amounted to approximately $1,800,000. Ninety-five percent of these sales were made in the States of Oregon ($1,212,000), California ($211,000), and Washington ($289,000). Plaintiff's president admitted on cross-examination, however, that these sales probably included the toffee sold by Job's Daughters of Oregon, which packages did not bear the name "Sweetarts". The sales by Job's Daughters of Oregon were a substantial portion of the total sales in that state.
From July 1, 1959, through June 30, 1964, approximately $514,000 of sales were in some way identified by the "Sweetarts" name on the box: seventy-seven percent of these sales were made through Job's Daughters; three percent through the Rainbow Girls; seven percent through other fraternal and charitable organizations; and thirteen percent were sold in some other manner, including direct sales by mail to corporations or individuals that had been customers of the company in the past.
Plaintiff makes no effort to sell its products through brokers or the normal commercial outlets and channels. All of its sales are made either through the fraternal and charitable organizations or by direct mail to persons or companies who receive its literature mailed out during the holiday seasons and otherwise. The plaintiff does not advertise through newspapers, radio, television, or magazines. Its total promotional expense amounts to $1,000 a year, which includes the personal expenses of the president of plaintiff's company in attending conventions of the various fraternal and charitable groups and the cost of letters to its customers. The plaintiff's president testified that consideration was being given to sales through commercial channels, but based on the efforts of plaintiff's during the past eighteen years there is no reason to believe the pattern of plaintiff's business *774 will change. Outside the States of California, Oregon and Washington, plaintiff's sales have been small and on a very irregular basis, to either a single customer or through a charitable or fraternal organization.
Defendant Sunline, Inc., is the successor to a partnership known as Fruzola Company which was started in St. Louis, Missouri, in about 1952. The partnership was an outgrowth of a sole proprietorship, also known as Fruzola Company, which was started in Salt Lake City, Utah, in about 1934. The Fruzola Company at Salt Lake City is still in existence and handles defendant's sales in the western part of the United States. Initially, the primary product of the sole proprietorship was a powdered soft-drink base or preparation. In about 1942, the sole proprietorship commenced to produce and sell a powdered or granulated product, made of dextrose, citric acid, artificial color and flavor, identified and sold under the name "Lik-M-Aid". This product had national distribution as early as 1952. The "Lik-M-Aid" preparation was also packaged in a drinking straw and sold under the name "Pixy Stix". "Lik-M-Aid" and "Pixy Stix" were sold and designed for sale to youngsters for one cent each or in groups of five for five cents. The history of defendant's operation is that it sold its products through candy brokers, manufacturers' representatives, wholesalers and jobbers, who in turn sell to retail accounts consisting of grocery stores, drug stores, confectionaries and others. Some of defendant's sales are made directly to large national accounts such as Woolworths and Butler Brothers. Defendant has never made any sales to charitable or fraternal organizations, and does not contemplate doing so in the future.
In 1962 defendant decided to develop the same formula in a tablet form. The nature of defendant's product is sweet and tart and by January 1963 it had determined to use the name "Sweetarts" to characterize its new product. In January 1963 the defendant caused a trademark search to be made which purported to search the records of the United States Patent Office, the fifty states, common law marks published in trade association lists, business titles, and trade names for corporate titles available. The defendant discovered the name "Sweetheart" was registered in 1959 under Class 46 for use in connection with candy drops; the name "Sweetheart" was registered in 1925 and republished in 1949 under Class 46 for use in connection with canned food, relishes, bakery goods, candy, cheese, milk, etc.; the name "Sweet-Hearts" was pending in 1962 under Class 46 for use with chocolate; the name "Sweetarts" was registered in 1928 under Class 46 for use in connection with dried prunes by Sweetarts Company, Dundee, Oregon; and the name "Sweetart" was registered in 1925 under Item 46 for use in connection with fresh cranberries and cranberry jelly by a company in Boston, Massachusetts. There were a number of other names of companies using "Sweet Heart" in connection with candies and coconut cream eggs, which were state registrations and certain common law trademarks. Both the name "Sweetarts" for dried prunes and "Sweetart" for cranberries had the notice "not registered", indicating that the registration had expired and had not been renewed. The defendant's lawyer advised it against use of the name "Sweetarts" because of the similarity to the name "Sweetheart" used in connection with candy. The defendant checked Dun and Bradstreet and found no listing for the Sweetarts Company of Dundee, Oregon. Defendant attempted to discover what he could about the other firms using the names "Sweetheart" and "Sweetarts".
A tinfoil package with paper lining was designed for defendant's new products and the design was stabilized for five- and ten-cent packages. Tablet-making machinery was obtained. Limited quantities of the products were placed on retail store counters in the St. Louis area during the months of April and May 1963; the first interstate shipment of the defendant's product was made in *775 June 1963; and, by October 1963 defendant's operation was well under way with distribution in forty-seven of the fifty states. Approximately six thousand mailing pieces were mailed to all of the jobbers in October 1963. From June 1963 until April 1965 defendant's wholesale sales of its "Sweetarts" sour candy tablet amounted to approximately $8,800,000. Sales were made to approximately six thousand jobbers in two thousand cities throughout the United States, which represented at least one hundred and fifty thousand retail accounts. Defendant's total promotional expense for its "Sweetarts" sour candy tablet through April 1965 totalled $2,300,000.
On October 22, 1963, defendant received a letter from plaintiff's counsel objecting to defendant's use of the name "Sweetarts" because "Sweetarts has a trade mark registered with the United States Patent Office on the use of their name in connection with the production and sale of candies * * *." This letter was defendant's first knowledge of any actual use by the plaintiff or anyone else of this name in connection with candy. On October 23, 1963, defendant, through its patent counsel, contacted Trademark Service Corporation, who made the original search for defendant, and they advised that in their original January 1963 search they had not reported plaintiff's renewal in 1948 of the trademark registration of the name "Sweetarts" in connection with dried prunes. Defendant immediately contacted their candy broker in Portland, Oregon, and gave them the address of plaintiff's plant. The candy broker finally obtained a box of the butter toffee from plaintiff and shipped it to defendant. On October 30, 1963, defendant obtained a Dun and Bradstreet report on plaintiff which set forth the term "mellow sweets" under the company name "Sweetarts". The Dun and Bradstreet report made no reference to the use of the term "Sweetarts" by plaintiff as a trademark to identify candy. Defendant filed an application for the use of the trademark "Sweetarts" in connection with its product on November 5, 1963, which was denied. This suit was filed in June 1964.
Neither the defendant nor his counsel had knowledge of the use of the name "Sweetarts" in connection with candy until defendant received the letter from plaintiff's counsel on October 22, 1963. Defendant's investigation immediately thereafter still did not disclose any use of the name "Sweetarts" in conjunction with candy. Defendant's candy broker in Portland, when requested to make an investigation of the plaintiff on October 24, 1963, had no information about the plaintiff and his contact with a number of candy brokers in the area disclosed nothing that would indicate plaintiff was in the business of selling candy under the name "Sweetarts".
We shall dispose first of plaintiff's claim of trademark infringement. 15 U.S.C. § 1057(a) provides that a trademark registration shall state the particular goods for which the trademark is registered. 15 U.S.C. § 1057(b) provides that a registration shall be prima facie evidence of the registrant's exclusive rights to use the mark in commerce in connection with the goods specified in the certificate. 15 U.S.C. § 1059 provides that registration may be renewed upon the filing of a verified application setting forth those goods recited in the registration in connection with which the mark is still in use in commerce. The trademark registration of plaintiff was limited to use in connection with dried prunes. The undisputed facts show that prunes have not been used in connection with the mark "Sweetarts" by the plaintiff since 1942. At the time the mark was renewed in 1948, there was no use by the plaintiff of the mark in connection with prunes. Accordingly, the renewal of the mark is invalid and without legal effect because of non-use in connection with prunes since 1942.
Further, the Eighth Circuit has long held that a trademark registration is limited strictly to the item for which it is registered and used. See Walgreen Drug Stores v. Obear-Nester *776 Glass Co., 113 F.2d 956 (8th Cir. 1940), where the Court held that the term "Pyrex" upon nursing bottles did not constitute an infringement of plaintiff's trademark "Rex" as registered for use on prescription bottles. It is true, of course, that a descriptive mark can obtain a secondary meaning, Pure Foods v. Minute Maid Corp., 214 F.2d 792 (5th Cir. 1954); G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385 (7th Cir. 1959). However, as the Eighth Circuit pointed out in Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., 199 F.2d 407, 414 (8th Cir. 1952):
"The exclusiveness of the monopoly of a descriptive mark with an attained secondary meaning given by statutory registration is limited. It is by no means absolute. The extent of the field to which it extends is circumscribed by the nature of goods specified in the registration to which it is to be applied, * * *"
The plaintiff would have its registration extend to all items under Class 46, but it is obvious that neither the Courts nor the Patent Office extend the mark in this manner. The Patent Office has even permitted various different registrations of the name "Sweetheart" in connection with different kinds of candy. It is clear that the plaintiff's registered trademark "Sweetarts" has not attained any secondary meaning.
Of particular interest to the instant case is Sears, Roebuck & Co. v. All States Life Insurance Co., 246 F.2d 161 (5th Cir. 1957), where the Court held that "All States Life Insurance Co.", engaged in the business of selling life insurance, did not infringe the registered trademark "Allstate". The name "Allstate" had been used to identify many products, including policies of automobile and general casualty insurance sold by "All State Insurance Co." The Court held that it is a question of fact whether there is a likelihood of confusion even when there is an identical name and in this instance held there was no likelihood of confusion because the products in question were non-competing. As we point out infra, there is no likelihood of confusion in this case. Accordingly, we find that plaintiff is entitled to no relief on its claim for trademark infringement.
Turning to plaintiff's claim of unfair competition, the Court finds that the defendant's adoption and use of the name "Sweetarts" was made in good faith, the defendant being completely unaware of any prior usage by plaintiff of this name in the candy field. Because of the sporadic, irregular and small sales which the plaintiff has made of his goods, his right to relief, if any, is limited to the States of California, Oregon and Washington. This is not the type of case where the plaintiff has a strong mark which has gained wide acceptance and defendant is attempting to ride on the reputation of the plaintiff. The situation is just the reverse. In the two years that defendant has used and sold its product, it is clear that the wide public acceptance of this product is far greater than anything the plaintiff has been able to accomplish in a period of thirty-nine years from 1926 to 1965.
Regarding the differing market areas, we note the early case of Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), which held that a flour manufacturer who first used the words "Tea Rose" in territory north of the Ohio River had no right to enjoin the use in Alabama of the same name by another flour manufacturer, who, in good faith and without knowledge of the other trademark, had developed and used the name "Tea Rose" in the southeastern states. To the same effect is United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918), which holds that the courts will not protect the user of a mark which another has innocently adopted in an area where the first user has not had an effect on the market place.
Regarding the question of confusion and mistake, the courts have recognized that each case must be studied on its own facts even where the same name is *777 used. See Restatement of Torts, § 730 and § 731. In the case of Benrose Fabrics Corp. v. Rosenstein, 183 F.2d 355 (7th Cir. 1950), the Court held that the name "Benrose" for use on fabrics intended for wearing apparel is not infringed by the use of the name "Ben Rose" for use on fabrics intended for interior decorating. Also see Hyde Park Clothes v. Hyde Park Fashions, 204 F.2d 223 (2nd Cir. 1953), and Paul Sachs Originals Co. v. Sachs, 325 F.2d 212 (9th Cir. 1963).
The evidence in the present case shows that plaintiff's and defendant's products are not competitive goods and it is clear that there is no confusion or likelihood of confusion by prospective purchasers. The primary thrust of plaintiff's entire business is to charitable and fraternal organizations. Its primary product is butter toffee with some assorted chocolates; the defendant's product is a candy tablet in a distinct and different package, which sells for different prices and is directed to the general public through commercial channels with emphasis on the teenagers and younger children, not to charitable organizations. The price of defendant's product is five cents and ten cents. The plaintiff's products are priced from $1.00 and $1.35 for butter toffee and from $1.70 to $7.70 for boxes of chocolates. The products are not competing. The plaintiff has shown no loss in sales, there is no likelihood that its business will be harmed or injured in any manner, the defendant is not trying to ride on the reputation of the plaintiff because what reputation it has is in an entirely different market place.
The present case is clearly distinguishable on the facts from Heublein, Inc. v. David Sherman Corporation, 223 F.Supp. 430 (E.D.Mo.1963), where the defendant's use of the trademark "Sarnoff" for vodka was so similar to the plaintiff's trademark "Smirnoff" that it was likely to cause confusion and mistake and deceive buyers as to the source and contents of the bottles so labelled. The name "Smirnoff" was widely known and respected throughout the United States in connection with vodka. The present case is also readily distinguishable from Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755 (2nd Cir. 1960), where the trademark for a hair dressing ("Brylcreem") was in the field first and the defendant deliberately designed his package and carton and product in an identical manner as that of "Brylcreem" and adopted the name "Valcream". The evidence at trial showed that people were confused between the two.
Accordingly, we hold that the plaintiff is entitled to no relief under the law of unfair competition even in the States of California, Washington and Oregon, and certainly not in other places in the United States. A judgment will be entered dismissing plaintiff's complaint at its costs.