**ROBINSON COMPANY, Plaintiff,**

v.

**PLASTICS RESEARCH AND DEVELOPMENT CORPORATION, Defendant.**

**Civ. A. No. 2001.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

March 8, 1967.

854

Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., Hardin, Barton, Hardin & Jesson, Fort Smith, Ark., for plaintiff.

Beale & Jones, Washington, D. C., Shaw, Jones & Shaw, Bethell & Pearce, Ft. Smith, Ark., for defendant.

## OPINION

JOHN E. MILLER, District Judge.

The plaintiff, Robinson Company, hereinafter referred to as Robinson, is a corporation organized and existing under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia. The defendant, Plastics Research and Development Corporation, hereinafter referred to as Plastics Research, is a corporation, organized and existing under the laws of the State of Arkansas with its principal place of business in Fort Smith, Arkansas.

The action was commenced on June 22, 1966, by the plaintiff with the filing of its complaint, in which it seeks to enjoin the defendant from infringing the plaintiff's registered trademark and to recover profits for alleged prior infringement.

The defendant's answer, filed July 12, 1966, denies any infringement, pleads certain affirmative defenses, and seeks affirmative relief by counterclaim, which are more specifically referred to hereinafter.

The court has jurisdiction by virtue of 28 U.S.C.A. § 1338(a) and 15 U.S.C.A. § 1121.

Robinson is the record owner of the federal trademark registration, dated March 29, 1960, covering the trademark "REB-L." The certificate of registration describes the goods on which the trademark "REB-L" was used as "fish-ing tackle, i. e., fishing poles, line, processed bait, hooks, artificial lures, sinkers, floats, lures, and rods in Class 22." [1]

Plastics Research commenced the use of its mark "Rebel" on a minnow plug of its own design and manufacture in early 1963 without knowledge of any use of a similar designation by others. The effectiveness and immediate acceptance of this "Rebel" minnow plug caused the sales of Plastics Research to increase rapidly and tremendously—500,000 were sold in 1963. In 1963 Robinson purchased $1,729.56; in 1964, $6,763.07; in 1965, $6,711.75; and in 1966, $6,928.99, of the "Amazing Rebel Minnow." Since 1963 Plastics Research has expended approximately half a million dollars on advertising and equipment, in addition to a sizable payroll increase for many additional employees. The sales approached two million "Rebel" minnow plugs in 1966.

Robinson is not a manufacturer of anything. It is a jobber of goods manufactured by others. During the period from September 1963 to October 11, 1966, almost four months after the filing of the instant suit, Robinson purchased and jobbed the "Rebel" minnow plugs made by Plastics Research. Robinson also printed and distributed an annual catalogue which featured the "Rebel" minnow plugs that are manufactured and sold by Plastics Research. As an aid to Robinson in selling the "Rebel" minnow plugs, Plastics Research furnished Robinson with advertising covering 21 types of the "Amazing Rebel Minnow" (Deft.'s Ex. 7). An examination of these catalogues, introduced as plaintiff's Exhibits 8 through 16, disclosed that Robinson advertised only fishing poles, rods, line, processed bait, hooks, sinkers, floats, and, as Mr. E. G. Robinson, President of plain-

1. In addition to the allegations contained in the complaint that the trademark "REB-L" was used on the goods described in the certificate of registration, Robinson also alleged use of the trademark in an affidavit filed on January 10, 1966, as required by Sec. 8(a) of the Trademark Act (15 U.S.C.A. § 1058(a)), but for some unexplained reason continuous use of the mark on the goods was not alleged and the uncontestability benefits were not claimed as permitted by Sec. 15 of the Trademark Act, 15 U.S.C.A. § 1065. A copy of the affidavit appears as Exhibit B to the response filed November 1, 1966, of Plastics Research's motion for summary judgment.

tiff, testified, "popping bugs, flies, worms, and lizards," together with minnow buckets and other hardware ordinarily used by the average fisherman.

The sale of the "Rebel" minnow increased so rapidly that at the time the instant suit was commenced it was sold in the north, south, east and west of the United States. The fame of the "Rebel" minnow became such that the national *Fresh and Salt Water Fishing* magazine for the year 1966 published an article, beginning on page 21, entitled "The Great Minnow Artificials." In the article it is stated that "only in the past three years have the lure mechanics come up with over-all design, life-like action and that mysterious 'something' that makes fish strike as never before." On page 22 there appears a picture of two "Rapala" lures and four models of the "Rebel" minnow. The author refers to the excitement that was created by the introduction of the Finnish lure—"Rapala," and states:

> "Since all this original excitement took place there has been the introduction of the usual copies of the original Rapala, but much more important, it brought about further research into this particular type of lure. As a result, two well known American firms worked out their own designs and production methods for high performance minnow-artificial plugs. First top-contender was Plastics Research and Development Company's now famous 'Rebel.' This particular lure had one improvement over the original 'Rapala,' it cast better and seemed to 'run' a little truer at the faster speeds. Then they went another step and introduced a full line of plugs for both fresh and salt water and in every conceivable type of action. This includes top water, shallow runner, medium runner and the highly effective deep runners."

On page 23 appears a picture of the typical "Rebel" minnow.

Defendant's Exhibit 8 is a copy of *New 1966 Fishing* magazine, which contains advertisements of the "Rebel" min-

now on pages 9 and 12. Beginning on page 62 is an article entitled "The Top 10." In the article the author discusses ten types of plug or minnow lures. On page 63 the author states:

> "Rapala/Rebel—These two simply hadn't been around long enough for critical testing three years ago. Since then, however, I've caught enough of everything from crappies to muskies and striped bass on different-sized Rapalas and Rebels to know that each deserves high ranking as a top-water plug that will be around for a long time to come. To bring out the best floating, diving and fluttering action, the trick is to retrieve slowly in a series of sudden jerks (which hauls the lure beneath the surface), followed by long pauses to let it float back up in the fashion of an injured minnow. In addition, Rebel makes a sinking model that will permit you to fish the same way at whatever depth you suspect fish may be feeding."

As a result of the research and skill of Plastics Research, the "Amazing Rebel Minnow" was accepted by the fishing fraternity and, because of its effectiveness, every owner of a "Rebel" became an enthusiastic booster. Robinson observed this unprecedented acceptance by the fishing public, and over a year after purchasing, cataloguing and jobbing the "Rebel" minnow plugs, Robinson first charged Plastics Research with infringement of the trademark "REB-L" by a letter dated September 29, 1964, plaintiff's Exhibit 3, which letter reads as follows:

> "Gentlemen:
>
> "For sometime we have handled your 'Rebel Minnow' lure, and recently have had comments from our dealers on this name, since we have this name registered and use it for our private brand fishing tackle items.
>
> "We suggest that you have your attorneys check this registration in our name No. 695,253 with the Patents, Trade-Marks and Copyrights Department in Washington."

Whether such action was taken in an effort to recoup lost trademark rights or to capitalize on the efforts and good will of Plastics Research is not clear from the record. However, it is clear that Robinson was not using "REB-L" on plug-type lures, and that it continued to purchase, catalogue and job Plastics Research's "Rebel" minnow for approximately six months before making further complaint. After another six months or more, in December 1965, Plastics Research, in an effort to preserve their valuable customer relationship, agreed to license the use of "REB-L" from Robinson for an amount equal to .8 of 1 percent of the gross sales in dollars.

During the negotiations between Robinson and Plastics Research relative to the proposed contract and license agreement, Bill Norman, the former employee of Plastics Research, who was entirely familiar with the manufacturing process developed and used by Plastics Research, as well as the identity of the customers of Plastics Research, organized or caused to be organized a corporation designated as Rebel Manufacturing Company, Inc., and established its place of business at 2910 Jenny Lind, Fort Smith, Arkansas, on the same street and in the vicinity of the manufacturing plant of Plastics Research.

On January 4, 1966, Plastics Research wrote Robinson and stated that it was awaiting the contract and license agreement pertaining to the "REB-L" trademark that was discussed and agreed upon December 3, 1965, in the office of Robinson's attorney in Atlanta, Georgia. Plastics Research further advised that it had entered into litigation with Bill Norman, the principal incorporator of the Rebel Manufacturing Company, over the confusion caused by his entering into the lure-manufacturing business as Rebel Manufacturing Company; and that "it would certainly be of mutual benefit to Robinson Company and Plastics Research and Development Company to finalize the contract and license agreement."

Mr. Norman also desired to use the name "Rebel" in connection with his business. He evidently began negotiations with Robinson to accomplish this purpose.

Robinson's offer to Plastics Research was withdrawn by telegram on May 9, 1966, and on May 19, 1966, Norman and Robinson entered into a license agreement.

On July 12, 1966, Plastics Research filed a suit, No. 3858, in the Chancery Court of Sebastian County, Arkansas, against Bill Norman and the Rebel Manufacturing Company to enjoin them from manufacturing and selling the "Amazing Rebel Minnow," which Mr. Norman had helped design and manufacture while he was an employee of Plastics Research. In the trial of that case Mr. E. G. Robinson, President of Robinson, testified that several years ago Robinson used "REB-L" on lures, "but it didn't go and we didn't keep it." That case is now on appeal. Substantially the same testimony was given by Mr. Robinson in the trial of the instant case.

Robinson introduced plaintiff's Exhibit 7, a copy of registration No. 695,253 —"REB-L," and plaintiff's Exhibit 2, an instrument purporting to be the agreement entered into between Robinson and the Rebel Manufacturing Company. This instrument contained a page setting forth provisions whereby Robinson would retain certain controls over the production by the Rebel Manufacturing Company of items bearing Robinson's trademark. Mr. E. G. Robinson testified that this instrument reflects the agreement which the parties intended to enter into. The court is convinced that the signed instrument embodying the License Agreement with Rebel Manufacturing Company, Inc., did not contain any provisions for the licensor to exercise control over the nature and quality of the goods produced and sold under the license. The court is also convinced that page 4 of the plaintiff's Exhibit 2, which is the control page, was attached when it became necessary for Robinson to oppose the defendant's motion for summary judgment. The motion was denied because of the

existence of factual disputes which have now been resolved.

The "Amazing Rebel Minnows" manufactured by Plastics Research were packaged in boxes which conspicuously displayed their emblem and shipped in interstate commerce. In addition to the emblem appearing on the outside of the carton, the lures were individually packaged in a box which had the name "Rebel" printed on it, and inside the box were special instructions for the use of the plug. See defendant's Exhibit 10, a box containing 12 "Amazing Rebel Minnows." The following is a reproduction of the emblem which was used on that box:

The popping bugs, flies, worms, and lizards sold by Robinson were in containers bearing various labels, examples of which are reproduced below.

There was no proof adduced by plaintiff to show that any fisherman was confused or misled by the defendant. The uncontradicted evidence of regional salesmen is to the effect that the word "Rebel" meant a minnow plug manufactured and sold by Plastics Research, and no one was ever known to buy a "Rebel" minnow plug thinking that he was buying a "REB-L" lure.

In its answer the defendant admitted that "REB-L" was registered under No. 695,253 on the principal register in the U. S. Patent Office, but denied that "REB-L" is a trademark or that the

plaintiff is the owner thereof; denied that Robinson had in fact used said trademark in commerce on fishing tackle; denied that the use by defendant of "Rebel" has caused, or is causing or will cause any confusion with, or encroaches upon any right of the plaintiff.

By way of an affirmative defense, the defendant alleged that the plaintiff is a customer-jobber of the defendant, and has continually purchased "Rebel" lures from the defendant since 1963; has listed the defendant's "Rebel" lures in its catalogues, and has sold and is selling the defendant's "Rebel" lures in its trade area; that such purchases, promotions and sales estop the plaintiff from challenging the defendant's right to continue the use of "Rebel" on the defendant's lures, and the defendant specifically pleads estoppel; that the plaintiff has not used the term "REB-L" in connection with artificial lures and more particularly plug lures; that the defendant was without knowledge of the plaintiff's alleged use of "REB-L" on any goods at the time the defendant adopted and commenced the use of "Rebel" on defendant's lures; that the defendant's "Rebel" lures have been widely and favorably accepted by the public throughout the United States to the extent that "Rebel" identifies the defendant's lures and no others; that the plaintiff and defendant are not competitors and plaintiff is seeking to benefit improperly from the good will in and the work product of the defendant's "Rebel" lures, and in so doing comes into court with unclean hands.

The defendant incorporated in its answer a counterclaim in which, inter alia, it alleged:

(1) that plaintiff did not use "REB-L" as a trademark prior to the filing of application Serial No. 64,200 on December 12, 1958, and Registry No. 695,253 was fraudulently obtained;

(2) that plaintiff was not using "REB-L" as a trademark at the time of the filing of its Section 8 Affidavit of Use on January 10, 1966, and registration No. 695,253 was fraudulently prevented from being cancelled as to one or more of the specified goods;

(3) that plaintiff entered into a bare license agreement with Rebel Manufacturing Company to use "REB-L" with knowledge of the defendant's use of "Rebel" and with knowledge that Rebel Manufacturing Company's use was intended to cause confusion or mistake or to deceive purchasers;

(4) that plaintiff entered into a bare license agreement with Rebel Manufacturing Company to use "REB-L" on goods other than those upon which the plaintiff allegedly used or is using "REB-L" and the license is invalid.

It was further alleged that the buyer's license agreement with Rebel Manufacturing Company to use "REB-L" constitutes an abandonment of the trademark by plaintiff; that said license agreement is void and was executed in a conspiracy against Plastics Research.

The prayer of the counterclaim is that the complaint of Robinson be dismissed; that the court hold that Robinson has abandoned the trademark "REB-L" and forfeited its rights to challenge Plastics Research's use of "Rebel"; that the trademark registration No. 695,253 be cancelled as provided in 15 U.S.C.A. § 1119; that the license agreement between plaintiff and Rebel Manufacturing Company be declared invalid and void; that it be adjudged that Plastics Research is entitled to the use and registration of the trademark "Rebel" on fishing lures; that it be awarded profits acquired by Robinson from its unlawful license; and that Plastics Research be awarded costs, including attorneys' fees and such other and further relief as is just and equitable.

The question of Robinson's lawful registration of the trademark "REB-L" has not been contested seriously by the defendant. No evidence relevant to this issue was presented by the defendant at the trial, and the question was not argued by defendant in its brief. Therefore, the court has no reason to hold that the trademark registration of Robinson

for "REB-L" is other than a lawful and valid registration of said mark. This alone, however, is quite inconclusive of this dispute. Registration has very little substantive effect on the rights of any parties in a given trademark or on any question of infringement thereon. In Walgreen Drug Stores v. Obear-Nester Glass Co., (8 Cir. 1940) 113 F.2d 956, it is stated at page 960:

"Mere registration under the Federal Act does not create a trade-mark and confers no new rights to the mark claimed, nor, indeed, any greater rights than already existed at common law without registration. [Citing cases.] Registration is a method of recording for the protection of dealers, the public, and owners of trade-marks. It is notice of the claims of the owner affecting his right to the mark. But the right to such a trade-mark must have accrued from actual use, because such right is not created by registration of the mark. A trade-mark is inseparable from the good will of the business of its possessor and it exists only as an incident to the business in which it was lawfully acquired and with which it remains identified." (Citing cases.)

See, also, Griesedick Western Brewery Co. v. Peoples Brewing Co., (D.Minn. 1955) 56 F.Supp. 600, aff'd 149 F.2d 1019.

The question of actual infringement on the part of the defendant was not given extensive consideration by the parties, either in the presentation of evidence at the trial or in the discussion contained in their respective briefs. Instead, they have devoted most of their efforts to a resolution of the issues raised by the defendant's affirmative defenses, which have been referred to earlier in this opinion. These defenses, which will be discussed and decided later, are in the opinion of the court very pertinent to this controversy, but it is also this court's opinion that the question of infringement should be determined.

The essence of the wrong with respect to trademark infringement is stated in Walgreen Drug Stores v. Obear-Nester Glass Co., supra, at page 961 as follows:

"The law of trades-marks is a branch of the law of unfair competition * * *, and a trade-mark is infringed if such trade-mark, or a colorable imitation of it, is without authority placed upon substituted goods of the same class as those for which the mark has been appropriated. It would be a fraud for a producer or trader to use the trade-mark of another, and thus pass off his goods as the goods of the proprietor of the trade-mark. *The vice consists in the sale of goods of one manufacturer or dealer as those of another by means of the use of such trademark.* Esso, Inc., v. Standard Oil Co. [8 Cir., 98 F.2d 1], supra; F. W. Fitch Co. v. Camille, Inc. [8 Cir., 106 F.2d 635], supra. To warrant relief in equity, it must appear that false representation is directly or impliedly made." (Emphasis added.)

The test for determining whether or not the use of a trademark by one infringes on the rights thereto of another is outlined in 87 C.J.S. Trade-Marks, Trade Names, and Unfair Competition, §§ 68–70:

"Whether or not an imitation which is not an exact copy constitutes an infringement depends on whether the resemblance is sufficiently close to deceive purchasers and so pass off the goods of one man as being those of another * * *." Page 289.

"In determining whether an alleged infringing trade-mark is sufficiently similar to plaintiff's trade-mark to be deceptive, and therefore an infringement, the standard is whether ordinary purchasers, buying under the usual conditions prevailing in the trade, and giving such attention as such purchasers usually give in buying that class of goods, would be deceived." Page 295.

"What similarity between two marks is sufficient to deceive, and hence to constitute an infringement, is a ques-

tion of fact to be determined in each case by its own circumstances, and prior decisions are not conclusive but are helpful only as laying down general principles." Page 297.

■■ When all factors surrounding the use by Plastics Research of the term "Rebel" are considered in connection with those surrounding the use of "REB-L" by Robinson, it is clear that deception or confusion of the public would not likely result. Here we are dealing with fishing tackle, a highly specialized type of goods which is used by a segment of the population composed almost entirely of professional and amateur fishermen. In purchasing their equipment, these people exercise a high degree of care to make certain they purchase exactly what they want. It is unlikely that these people would readily be confused even if the trademarks in question were very similar. But here it is a fact that the two marks are not similar. When spoken, the two terms, "REB-L" and "Rebel," would, of course, be indistinguishable. Similarity in sound is a factor to be considered, McCormick & Co. v. B. Manischewitz Co., (6 Cir. 1953) 206 F.2d 744; Stix, Baer & Fuller Co. v. Alfred J. Sweet Co., (8 Cir. 1931) 49 F.2d 598, but "Ocular comparison of the tout ensemble is the best means of determining the fact of deceptive and infringing imitation." 87 C.J.S., Trade-Marks, Trade Names, And Unfair Competition, § 68, p. 290. This is especially true where, as in the instant case, the goods which might be confused are usually sold from display racks and are placed out where they can be readily observed by the customer prior to purchase. The examples of Robinson's trademark which were introduced in evidence show that the mark is printed in either black or green ink on a white background with the printed words being the most outstanding feature of the whole trademark. Plastics Research's mark is quite distinguishable in that it consists of black lettering on a brightly colored (red, white and blue) circular field, with its most outstanding features being, not the printed words or the term "Rebel," but a representation of a Confederate flag along with a caricature of a fish wearing what appears to be a Confederate soldier's cap. (See illustration page 8.)

■ Upon a consideration of all the facts established by the evidence, the court is convinced that the two trademarks are not sufficiently similar so that ordinary purchasers of the type of goods in question, i. e., fishermen, would be deceived or would mistakenly believe that the "Rebel" lures were the product of Robinson. The use of the term "Rebel" on the lures of Plastics Research is not an infringement of Robinson's trademark.

In the plaintiff's brief the following statement appears:

"Plaintiff asserts that the term 'Rebel' is such a colorful imitation of plaintiff's registered trademark 'REB-L' that such use by the defendant constitutes infringement. The court indicated that it would make a judgment itself as to whether the terms are so similar as to be confusing. If the court decides that they are not confusingly similar, there would be nothing further for the court to decide in the case."

As stated earlier, a finding for the defendant on the issue of infringement would probably be determinative of this case, and as much is admitted by the plaintiff in its brief. However, because of the importance which both parties have placed on other issues, including the affirmative defenses raised by the defendant, the court feels that these questions merit discussion and decision so that all issues raised in the case might be determined.

The contention relied on by the defendant, in addition to lack of similarity or confusion, is that the defendant has not infringed on the plaintiff's trademark because the defendant has used the mark only on minnow-type lures, and the plaintiff had no exclusive right to the use of its trademark on this type of product.

■ In support of this contention the defendant relies primarily on Sweetarts v. Sunline, Inc., (E.D.Mo.1966) 255 F. Supp. 771, and Walgreen Stores v. Obear-Nester Glass Co., supra. These cases hold, and correctly so, that the mere registration and use of a trademark for one or more items within a class does not give the registrant any exclusive right to the use of that mark on every item in the class. This rule, correct as it may be, is not applicable to the instant suit.

In Walgreen, supra, the plaintiff owned the registered trademark "Rex" which it placed on glass bottles used for containing drugs of various sorts, pills in particular. Subsequent to the plaintiff's registration and use of the trademark as mentioned, the defendant began to use the term "Pyrex" on certain of its glass products, the term being used to designate types of glass containers which would withstand extreme temperatures. One type of container on which the defendant affixed the term "Pyrex" was baby nursing bottles. The defendant began producing these bottles, so labeled, in 1922. In 1923 the plaintiff expanded and also began to manufacture nursing bottles on which it affixed the term "Rex." In reversing the trial court, the Circuit Court held for the defendant on the theory that the limited use by the plaintiff of its trademark "Rex" only on bottles used for prescription drugs and sold only to druggists did not give it any exclusive right to the mark with respect to all items in the class. Since the products upon which the defendant affixed its mark (heat-resistant glassware for use in cooking, chemistry, and other areas where heat-resistant glass containers are especially useful) were not "of substantially the same descriptive qualities" as those on which the plaintiff had previously used its mark (glass containers for prescription drugs), there was no infringement.

The Sweetarts case, supra, which involved the use of a trademark on candy, was decided on the same theory. That decision was also based on the fact that the area in which the plaintiff-registrant sold its product was very limited geographically, and that there could be no confusion on the part of the public because it was unlikely that a buyer in the area of plaintiff's distribution would come in contact with the defendant's product, and vice versa.

■ Sweetarts and Walgreen are clearly distinguishable on their facts from the instant case. In those cases the plaintiff-registrant was held not to have an exclusive right to the use of a trademark on goods within the same class which were not "of substantially the same descriptive properties." Robinson registered and used its mark on "fishing tackle" in Class 22. It had used this mark on several types of tackle, including various lures, rods, minnow buckets and nets. If it were allowed to extend its use of the mark to all items in Class 22, it would include toys, games, and all sporting goods. Certainly no such monopolizing of an entire class would be allowed. Nor would Robinson even be allowed to extend its use of its mark to all items which might be referred to as "sporting goods." But the protection to which the owner of a trademark is entitled extends to products which would be reasonably thought by the buying public to come from the same source if sold under the same mark, and also extends to other products if those products are fairly within the normal field of expansion of the business. See Colonial Radio Corporation v. Colonial Television Corp., (S.D.N.Y.1948) 78 F.Supp. 546, and National Drying & Machinery Co. v. Ackoff, (E.D.Pa.1955) 129 F.Supp. 389, aff'd 228 F.2d 349, cert. den. 351 U.S. 906, 76 S.Ct. 694, 100 L.Ed. 1442. It is evident that minnow lures would be fairly within the normal field of expansion of Robinson's business.

This brings the court to a consideration of the defendant's affirmative defenses, which can be paraphrased as follows:

1. That the plaintiff has lost what exclusive right it might have had in the trademark "REB-L" because the plain-

tiff has abandoned the mark through nonuse.

2. That the plaintiff has lost his rights in the trademark because it abandoned the mark by executing a "naked license" to another for the uncontrolled use thereof.

3. That the plaintiff, because of its own conduct in connection with the defendant's use of the trademark, is estopped to seek relief for any alleged infringement.

The first defense raises essentially the same questions previously discussed. The defendant contends that since Robinson has failed to use its trademark on any plug-type lures since 1958, it has abandoned the trademark under 15 U.S.C.A. § 1127 [2] and has lost the right to exclusive use thereof on plug-type lures.

It is the opinion of the court that Colonial Radio Corp. v. Colonial Television Corp., supra, and National Drying & Machinery Co. v. Ackoff, supra, are conclusive on this point. It is clear that Robinson did use, and has continually used, its trademark on various fishing equipment, but not on minnow plug-type lures. The fact that it once used the mark on plug-type lures and then discontinued to do so no more works in the defendant's favor than did the fact that Robinson had never used the mark on minnow-type lures. Plug-type lures must certainly be considered to be fairly within the normal field of Robinson's business. Where a registrant discontinues to use a trademark on a certain product, he will not be held to have abandoned the mark if he continues to use the mark on related items, and if the discontinued product is one which would still be thought by the buying public to come from the same source and is one which remained in the normal field of expansion of the owner's business.

Nonuse is not the only means whereby an owner of a trademark may abandon his mark, and lose his rights thereto. The defendant contends that when Robinson entered into a licensing agreement with the Rebel Manufacturing Company, Inc., whereby Robinson allowed the licensee to use the term "REB-L" but retained no control over its use, this constituted a naked licensing agreement and effected an abandonment of the mark on the part of Robinson. This court agrees with the defendant. The granting of a naked license of a trademark to another "is an unlawful and improper use of the trademark * * * and amounts to an abandonment of any trade-mark rights that might otherwise exist in any names so used, and creates an estoppel against the assertion of trade-mark rights." Midwest Fur Producers Ass'n v. Mutation Mink Breeders Association, (W.D.Wisc.1955) 127 F.Supp. 217. That controlled licensing does not constitute an abandonment, while uncontrolled or naked licensing may, is because with controlled licensing the risk that the purchasing public will be deceived is thereby minimized. See R. C. W. Supervisors, Inc., v. Cuban Tobacco Co., (S.C.N.Y.1963) 220 F.Supp. 453. Also, as held in Midwest Fur Producers, supra, the uncontrolled license is unlawful. It is therefore void, and merely amounts to an owner's allowing another to use the trademark whereby the owner loses, by estoppel, his right to seek relief for infringement.

When this court had before it the defendant's motion for summary judgment, a copy of the alleged license agreement entered into between Robinson and the Rebel Manufacturing Company, Inc., was submitted in evidence.

---

2. Sec. 45 of the Trademark Act, 15 U.S.C.A. § 1127, Abandonment of Mark, provides:

"A mark shall be deemed to be 'abandoned'—

"(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment."

At that time the agreement contained page four on which were set forth specific controls which Robinson was to retain over the production of any items which were to be sold under the trademark in question. The evidence introduced at the trial established that this page was not in existence when the contract was signed, but was drafted and added to the instrument after it became apparent that controls were necessary to render the agreement valid. The plaintiff admitted that the signed license agreement contained no controls, but contended and introduced evidence that the parties had, prior to signing, agreed that Robinson was to retain certain controls, and that page four setting forth these controls was inadvertently omitted from the written document. Since, as plaintiff contends, it is the *right* to control rather than the actual exercise of control which determines whether or not a license is valid, this agreement between Robinson and Rebel Manufacturing Company, Inc., is valid only if Robinson retained the right to control Rebel Manufacturing Company, Inc., in the latter's use of the trademark. Clearly Robinson did not retain such right. Were he to attempt to enforce, in court, the alleged controls, he would doubtlessly be met with the parol evidence rule and would not be allowed to amend the original duly executed document by inserting in the document page four, which clearly modifies the original written instrument. See Jeter v. Windle, (1959) 229 Ark. 948, 319 S.W.2d 825; Dunlop Tire & Rubber Corp. v. Thompson, (8 Cir. 1959) 273 F.2d 396.

■ The court is convinced that Robinson retained no right to control Rebel Manufacturing Company, Inc., in its production, and the granting of the naked license was void and constituted an abandonment by Robinson of its trademark "REB-L."

This brings the court to a consideration of the third defense raised by Plastics Research—that the plaintiff, because of its conduct in purchasing from Plastics Research the lures carrying the trademark "Rebel" and selling same to its dealers, is now estopped to seek relief on account of any alleged infringement. On this point, again, the court must agree with the defendant. From 1963 up to and even after the commencement of this suit, Robinson purchased large quantities of these lures from Plastics Research. The term "Rebel" was conspicuously displayed on every carton. In 1963 Robinson purchased $1,729.56 worth of "Rebel" lures; $6,763.07 in 1964; $6,711.75 in 1965; and $6,978.99 in 1966. The last order was dated "10-7-66," over four months after Robinson filed its complaint against Plastics Research in this court. Robinson not only purchased and sold Plastics Research's "Rebel" lures, but it listed the lure in its catalogues, described every model, and gave the prices for each. All of the information concerning these lures was listed in the catalogue under the heading "Rebel Minnow."

That Robinson was somewhat displeased with the defendant's use of the term "Rebel" is evidenced by the two letters sent from Robinson to the defendant on September 29, 1964, and April 15, 1965, and by the fact that Robinson eventually filed this suit. It is also clear, however, that Robinson was not so displeased that it would discontinue placing orders for the lures because the "Rebel" minnow lures were in tremendous demand. Robinson recognized Plastics Research's success and chose to buy and sell its "Rebel" plug-type minnow lures. It appears that after Robinson recognized that the "Rebel" lures were established as one of the ten top lures, it proceeded to try to obtain another more favorable source for the lure (Rebel Manufacturing Company was by this time producing the exact copy) before filing this suit.

■ Under the facts so thoroughly established by the evidence, the court cannot grant Robinson the relief it now seeks. The statement of the District Court for the Southern District of New York in Valvoline Oil Co. v. Havoline

Oil Co., (1913) 211 F. 189, at page 195, is very pertinent:

" * * * it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most than can be said is that the trademark infringement is a genuinely debatable question."

 Here Robinson did even more than wait to see how successful Plastics Research would be before filing its suit. It helped and encouraged Plastics Research by purchasing these lures. That it did so for its own financial gain rather than out of any desire to help Plastics Research is immaterial. It cannot now be heard to complain.

Another statement, that of the court in Sweetarts v. Sunline, Inc., supra, 255 F.Supp. at page 776, is also very pertinent and applicable to the situation here:

"This is not the type of case where the plaintiff has a strong mark which has gained wide acceptance and defendant is attempting to ride on the reputation of the plaintiff. The situation is just the reverse. In the two years that defendant has used and sold its product, it is clear that the wide public acceptance of this product is far greater than anything the plaintiff has been able to accomplish in a period of thirty-nine years from 1926 to 1965."

Therefore, under the applicable law when applied to the facts as found by the court, the court holds that:

1. The defendant, Plastics Research and Development Corporation, has not infringed the trademark of the plaintiff;

2. That Robinson Company has abandoned its trademark and lost its exclusive rights thereto;

3. That the plaintiff, Robinson Company, is estopped to seek any relief from Plastics Research and Development Corporation; and

4. That the complaint of Robinson Company against Plastics Research and Development Corporation should be dismissed, and costs herein, not including attorneys' fees, be assessed against Robinson Company.

An order in accordance with the above is being entered today.